# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSEPH HARRINGTON, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No.: |
| v. | ) ) | CLASS ACTION |
| TETRAPHASE PHARMACEUTICALS INC., GUY MACDONALD, JOHN CRAIG THOMPSON, and DAVID LUBNER, | ) ) ) ) | COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS |
| Defendants. | ) ) ) ) | DEMAND FOR JURY TRIAL |

Plaintiff Joseph Harrington ("Plaintiff"), by his attorneys, except for his own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Tetraphase Pharmaceuticals Inc. ("Tetraphase" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased Tetraphase common stock between March 5, 2015 and September 8, 2015, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's claims are asserted against certain of Tetraphase's executive officers and directors.

2.      Tetraphase is a clinical stage biopharmaceutical company with a focus on creating antibiotics for drug-resistant bacteria. The Company's main drug candidate, Eravacycline, was being developed as a broad-spectrum intravenous and oral antibiotic to fight infections caused by drug-resistant gram-negative bacteria in the IGNITE program (Investigating Gram-negative Infections Treated with Eravacycline). This program included two phase 3 clinical trials: IGNITE1 for the indication of complicated intra-abdominal infections and IGNITE2 for the indication of complicated urinary tract infections.

3.      The IGNITE2 phase 3 clinical trial was a two-part, randomized, multi-center, double-blind clinical trial designed to assess the efficacy and safety of Eravacycline compared with Levofloxacin, a currently approved broad-spectrum antibiotic, in the treatment of

complicated urinary tract infections. The IGNITE2 phase 3 clinical trial was bifurcated into a lead-in portion and a pivotal portion.  Positive results from the lead-in portion were announced on September 2, 2014.  Tetraphase initiated patient enrollment in the pivotal portion of the trial in October 2014, and completed patient enrollment in May 2015.

4.     Since March 5, 2015, Tetraphase and certain of its officers and directors have misrepresented the efficacy and safety of Eravacycline, and attendant capacity for approval by both the U.S. Food and Drug Administration ("FDA") and the European Medicines Agency ("EMA"). For example, these materially false and misleading statements included, among others, that Eravacycline:

- Will "become the drug of choice for first-line empiric treatment of a wide variety of serious and life-threatening infections";

- "[R]epresents a significant innovation in the creation of tetracycline drugs that has the potential to reinvigorate the clinical and market potential of the class";

- Will "be used to treat patients successfully in hospitals, emergency rooms and out-patient clinic settings";

- "[I]s active against multidrug-resistant bacteria in ways that tetracyclines currently on the market or in development are not";

- Will be a "safe and effective treatment for [complicated urinary tract infections] and other serious and life-threatening infections for which we may develop eravacycline, such as hospital-acquired bacterial pneumonias"; and

- "[H]as the potential to be used as a first-line empiric monotherapy for the treatment of [complicated urinary tract infections] hospital-acquired bacterial pneumonias and other serious and life-threatening infections."

5.     On September 8, 2015, following close of market, Tetraphase issued a press release announcing results of the pivotal portion of the IGNITE2 phase 3 clinical trial of Eravacycline.  The Company disclosed that Eravacycline, administered as an intravenous (IV) to oral transition therapy for the treatment of complicated urinary tract infections, had failed to achieve its primary endpoint of statistical non-inferiority compared to Levofloxacin under the guidelines established by both the FDA and EMA.

6.     On this news, the price of Tetraphase common stock declined from a closing share price of $44.78 on September 8, 2015 to close at $8.36 per share on September 10, 2015, *a loss of more than 80% or $1.3 billion in market value*, on extremely heavy trading volume.

## JURISDICTION AND VENUE

7.     The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

9.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District.  Tetraphase is headquartered in this District, with its principal place of business located at 480 Arsenal Street, Suite 110, Watertown, MA 02472.

## PARTIES

11.     Plaintiff Joseph Harrington purchased Tetraphase securities as set forth herein and in his certification filed herewith.

12.     Tetraphase is a corporation organized and existing under the laws of the State of Delaware. Its common stock trades on the NasdaqGS ("NASDAQ") under the symbol, "TTPH."

13.     Defendant Guy Macdonald ("Macdonald") is the President, Chief Executive Officer ("CEO"), and a member of the board of directors of Tetraphase.

14.     Defendant John Craig Thompson ("Thompson") was the Chief Operating Officer ("COO") of Tetraphase from February 4, 2014 to December 31, 2015.  The Company issued a press release on December 21, 2015 announcing Thompson had resigned from his position as COO on December 15, 2015, effective December 31, 2015.

15.     Defendant David Lubner ("Lubner") was the Chief Financial Officer ("CFO") and Senior Vice President of Tetraphase from October 2010 to January 8, 2016. Lubner was also previously the COO of Tetraphase from 2006 until October 2010.  The Company issued a press release on January 4, 2016 announcing Lubner had resigned from his positions as CFO and Senior Vice President on January 1, 2016, effective January 8, 2016.

16.     Macdonald, Thompson, and Lubner are collectively referred to herein as the "Individual Defendants."

17.     Tetraphase and the Individual Defendants are collectively referred to herein as "Defendants."

## CONTROL PERSON ALLEGATIONS

18.     By reason of the Individual Defendants' positions with the Company as executive officers (and in Macdonald's case, as a director as well) the Individual Defendants possessed the

power and authority to control the contents of Tetraphase's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to him but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Tetraphase is a clinical-stage biopharmaceutical company. The Company uses its chemistry technology to create novel antibiotics for serious and life-threatening multidrug-resistant infections. Tetraphase's lead product candidate, Eravacycline, is a fully synthetic tetracycline derivative, developed for use as a first-line empiric monotherapy for the treatment of multidrug-resistant infections, including multidrug-resistant Gram-negative infections. Eravacycline is in a phase 3 clinical trial program called IGNITE for the treatment of complicated intra-abdominal infections (IGNITE 1), and complicated urinary tract infections (IGNITE 2).

20.     IGNITE2 was a two-part, randomized, multi-center, double-blind, phase 3 clinical trial designed to assess the efficacy and safety of Eravacycline compared with Levofloxacin, a currently available antibiotic, in the treatment of complex urinary tract infections. The two-part

trial featured a lead-in portion which was designed to determine the dose regimen to be carried forward into the pivotal portion of the trial.

21.     Eravacycline is Tetraphase's most important drug product, and the only drug candidate at the clinical trial stage. In the Company's Annual Report on Form 10-K, filed with the SEC on March 6, 2015 (the "10-K"), Tetraphase stated: "[o]ur ability to become and remain profitable depends on our ability to generate revenue. We do not expect to generate significant revenue unless and until we obtain marketing approval for, and commercialize, eravacycline."

22.     On April 2, 2014, Tetraphase announced that the FDA had granted Fast Track designations for both the IV and oral formulations of Eravacycline.  Fast Track designation is awarded to expedite the study and regulatory review of drugs intended to treat serious or life-threatening conditions. Eravacycline became eligible for Fast Track status as a result of being designated a Qualified Infectious Disease Product ("QIDP"); the QIDP designation also makes Eravacycline eligible for priority review, and more frequent meetings and written correspondence with the FDA regarding the drug's development plan. Priority review, in turn, shortens the FDA review process for a new drug from ten months to six months.

23.     On September 2, 2014, Tetraphase announced positive top-line results from the lead-in portion of its IGNITE 2 clinical trial.  Data from the lead-in portion demonstrated that both IV-to-oral dosing regimens of Eravacycline compared favorably to Levofloxacin under statistical endpoints established by both the FDA and the EMA.  On news of the positive results, the Tetraphase price per share increased from $13.09 on September 2, 2014 to $16.96 per share on September 11, 2014, an increase of nearly 30%.

24.     In light of these positive results, the Company announced on October 6, 2014, that it had initiated patient enrollment in the pivotal portion of its IGNITE 2 clinical trial.  This

announcement sent the Tetraphase price per share upward from $20.85 per share on October 1, 2014 to $24.71 per share on October 14, 2014, an increase of 18.5%. According to the Company's Quarterly Report on Form 10-Q filed with the SEC on May 7, 2015, the Company completed enrollment in the pivotal portion of IGNITE2 in May 2015 and expected to have top-line data in the third quarter of 2015, i.e. sometime between July 1, 2015 and September 30, 2015.

**The Material Misrepresentations and Omissions**

25.     On March 5, 2015, the beginning of the Class Period, Tetraphase filed a Form 8-K with the SEC announcing its full year and fourth quarter 2014 financial results. In the press release, Defendant Macdonald touted the efficacy and outlook of Tetraphase's lead drug candidate, Eravacycline. In relevant part, Defendant Macdonald stated:

> In 2014, Tetraphase made significant progress in the development of eravacycline, our lead antibiotic candidate to treat bacterial infections, including those caused by MDR Gram-negative bacteria. We reported positive top-line results from IGNITE 1, a pivotal Phase 3 clinical trial, which met its primary endpoint of efficacy and safety of intravenous (IV) eravacycline in patients with complicated intra-abdominal infections (cIAI). Prior to that, we reported positive top-line results from the lead-in portion of IGNITE 2, our second pivotal Phase 3 clinical trial, ***which validated the activity and safety profile of IV-to-oral transition therapy in complicated urinary tract infections (cUTI). We look forward to reporting top-line results from the pivotal portion of IGNITE 2 mid-year and continue to target submission of a New Drug Application (NDA) for both indications by year end.***

(Emphasis added.)

26.     The following day, on March 6, 2015, the Company filed the 2014 Annual Report on Form 10-K with the SEC, in which it described Eravacycline as a "significant innovation" with "the potential to reinvigorate the clinical and market potential of the class." In relevant part, the 10-K also stated, *inter alia*, the following:

Gram-negative bacteria that are resistant to all available antibiotics are increasingly common and a growing threat to public health. We believe that *the ability of eravacycline to cover multidrug-resistant Gram-negative bacteria, as well as multidrug-resistant Gram-positive, anaerobic and atypical bacteria, and its potential for IV-to-oral transition therapy, will enable eravacycline to become the drug of choice for first-line empiric treatment of a wide variety of serious and life-threatening infections*.

\*\*\*

Due to gaps in the spectrum of coverage of antibiotics, physicians are often confronted with the need to design complicated multi-drug cocktails for the first-line empiric treatment of patients with serious infections. The clinical situation is further complicated when each drug in the multi-drug cocktail has a different dosing regimen, such as two, three or four times a day, resulting in an added burden on the pharmacy and nursing staff, higher costs due to multiple drug administrations and an increased potential for medical errors or drug-drug interactions. We believe that, *with the exception of eravacycline, most of the antibiotics that are in development or have recently been approved by the FDA that are intended to cover a broad spectrum of bacteria, including Gram-negative bacteria, or solely to address Gram-negative bacteria, are being developed or are approved for use in combination with one or more other antibiotics, and require the addition of a third drug such as metronidazole to address the presence of anaerobic bacteria*.

\*\*\*

In designing eravacycline, we inserted a fluorine atom into the tetracycline scaffold, which we call a fluorocycline, and modified the scaffold at another position. We believe that these modifications enable eravacycline to not be subject to tetracycline-specific mechanisms of drug resistance. As a result, *we believe that eravacycline is active against multidrug-resistant bacteria in ways that tetracyclines currently on the market or in development are not*.

(Emphasis added.)

27.     Then, on May 6, 2015, Tetraphase issued a press release announcing its first quarter 2015 financial results.  In the press release, Defendant Macdonald projected that the Company would submit a New Drug Application to the FDA for Eravacycline by year-end 2015:

We've had a strong start to 2015, setting the stage for what we believe will be a very productive year for the company. Last month, we presented detailed results from IGNITE1, our pivotal phase 3 clinical trial, which met its primary endpoint of efficacy and safety of intravenous (IV) eravacycline in patients with complicated intra-abdominal infections (cIAI). We are also pleased to announce that we recently completed patient enrollment in the pivotal portion of IGNITE2, our second phase 3 clinical trial of eravacycline for the treatment of complicated urinary tract infections (cUTI). Following the requisite protocol-specified follow-

up visits and database lock activities we expect top-line data from IGNITE2 to be available in the third quarter of 2015, and are ***targeting a submission of our New Drug Application (NDA) for both IV and oral formulations in cIAI and cUTI by year-end 2015***. We were also pleased to have raised an additional $173 million through a public offering which will ***allow us to prepare for commercial launch of eravacycline***.

(Emphasis added.)

28.    Accordingly, Defendant Macdonald continued to tout the efficacy and outlook of Eravacycline and imply the drug would most likely be approved by the FDA by year-end 2015. These overtly positive representations continued in Form 10-Q's, Form 8-K's, and Company press releases filed or issued throughout the Class Period.

29.    For example, on August 6, 2015, the Company filed its Quarterly Report on Form 10-Q with the SEC, in which it stated that "the Company expects to submit an NDA to the FDA by the end of 2015 and a marketing authorization application to the European Medicines Agency in the first half of 2016."  In addition, the Quarterly Report for the second quarter 2015 falsely warned Tetraphase investors that "[w]e expect that our expenses will increase substantially as we conclude activities related to our phase 3 clinical trial of eravacycline for the treatment of [complicated urinary tract infections], seek marketing approval for eravacycline, conduct pre-commercialization and launch-related activities for eravacycline."

30.    Then, on August 9, 2015, Defendant Macdonald held an earnings call with analysts to discuss the second quarter 2015 financial results and the Company's "significant progress against our 2015 objectives." In relevant part, Defendant Macdonald also stated on the earnings call, *inter alia*, the following:

***In the second quarter we made significant progress against our 2015 objectives.*** In April, at ECCMID, the European anti-infectives meeting, we reported detailed positive results from IGNITE1, our pivotal Phase 3 clinical trial evaluating the safety and efficacy of eravacycline for the treatment of complicated intra-abdominal infections, as well as ***detailed positive data from the lead-in portion of***

*IGNITE2, our second Phase 3 clinical trial of eravacycline for the treatment of complicated urinary tract infections.* In May, we completed enrollment in the pivotal portion of IGNITE2 and we remain on track to announce top-line data this quarter.

***

It is an extremely busy time for us at Tetraphase as *we move toward completion of the Phase 3 IGNITE program for eravacycline and NDA filing and as we advance our other pipeline candidates*. We continue to build out the organization through the addition of key team members and *to conduct our pre-commercialization activities for eravacycline. We are excited about the prospect of being able to offer physicians a novel broad-spectrum antibiotic with potent activity against difficult-to-treat multi-drug resistant bacteria and continue to move closer to achieving that goal*.

***

*[O]ur plan right now on our current timeline is to have approval and to launch towards the end of next year.* We're only just in the early stages of having discussions with payers. We're clearly very interested to follow the launches of Zerbaxa and Avycaz with very different positioning and pricing strategies and that also will play into the discussions we continue to have with payers when we look at the value that we think eravacycline adds to the armamentarium for physicians.

(Emphasis Added.)

31.     At all relevant times, these statements were false and misleading because Tetraphase management was well aware that the pivotal portion of the IGNITE2 phase 3 clinical trial of Eravacycline would fail to achieve its primary endpoint of statistical non-inferiority compared to Levofloxacin. Specifically, because of Eravacycline's fast-track designation by the FDA, Tetraphase management was in constant communication with the FDA regarding the status of the ongoing IGNITE2 phase 3 clinical trial and had actual knowledge that Eravacycline was underperforming when compared to Levofloxacin. Despite this, Tetraphase management continued to mislead investors regarding the status of the IGNITE2 phase 3 clinical trial, the efficacy and safety of Eravacycline, and Eravacycline's attendant likelihood for approval by either the FDA or the EMA.

**The Truth Emerges**

32.     On September 8, 2015, the Company issued a press release announcing that the pivotal portion of the IGNITE2 phase 3 clinical trial of Eravacycline administered as an IV to oral transition therapy for the treatment of complicated urinary tract infections did not achieve its primary endpoint of statistical non-inferiority compared to Levofloxacin. Significantly, Eravacycline failed to meet the statistical endpoints established by both the FDA and the EMA. The press release stated in pertinent part:

> WATERTOWN, Mass., Sept. 8, 2015 (GLOBE NEWSWIRE) -- Tetraphase Pharmaceuticals, Inc. (NASDAQ:TTPH), a clinical stage biopharmaceutical company developing novel antibiotics to treat life-threatening multidrug-resistant (MDR) infections, today announced that *the IGNITE2 phase 3 clinical trial of eravacycline administered as an IV to oral transition therapy for the treatment of complicated urinary tract infections (cUTI) did not achieve its primary endpoint of statistical non-inferiority compared to levofloxacin*.
>
> "We are disappointed that the IGNITE2 trial did not achieve its primary endpoint. We plan to further analyze the data and provide an update after we have discussed the data and our plans for a path forward with the regulatory agencies," said Guy Macdonald, President and CEO of Tetraphase. "We previously announced positive data from the IGNITE1 phase 3 clinical trial of eravacycline administered intravenously in complicated intra-abdominal infections which did meet its primary endpoint, demonstrating high cure rates in prevalent Gram-negative pathogens and a favorable safety profile."
>
> Macdonald added, "We continue to believe that eravacycline can benefit patients with serious infections, particularly those caused by difficult-to-treat Gram-negative bacteria."
>
> The pivotal portion of the phase 3 IGNITE2 clinical trial enrolled 908 patients who were randomized 1:1 to receive eravacycline (1.5 mg/kg intravenously every 24 hours followed by 200 mg orally every 12 hours) or levofloxacin (750 mg intravenously every 24 hours followed by 750 mg orally every 24 hours). Each patient received a minimum of 3 days of IV dosing and then, if clinically indicated, were eligible to transition to oral therapy for the remaining doses for a total treatment period of 7 days. For the U.S. Food and Drug Administration (FDA), the primary analysis evaluated the responder outcome (a combination of clinical cure rate and microbiological response) in the Microbiological Intent-to-Treat (micro-ITT) population at the Post-Treatment (PT) visit (defined as 6-8 days after the completion of therapy) using a 10% non-

inferiority margin. For the European Medicines Agency (EMA), the primary analysis evaluated the microbiological response in the microbiologically modified ITT (micro-MITT) population and microbiologically evaluable (ME) populations at the PT visit using a 10% non-inferiority margin. ***Eravacycline did not achieve the primary endpoint under either analysis***.

(Emphasis added.)

33. As a result the adverse results of the pivotal portion of the IGNITE2 phase 3 clinical trial of Eravacycline, the price of Tetraphase common stock declined from a closing share price of $44.78 on September 8, 2015 to close at $8.36 per share on September 10, 2015, ***a loss of more than 80% or $1.3 billion in market value***, on extremely heavy trading volume.

## ADDITIONAL SCIENTER ALLEGATIONS

34. As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Tetraphase, their control over, and/or receipt and/or modification of Tetraphase's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Tetraphase, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

35. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Tetraphase's securities and operated as a fraud or deceit on

Class Period purchasers of Tetraphase securities by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Tetraphase's securities fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Tetraphase securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**APPLICATION OF PRESUMPTION OF RELIANCE:**
**<u>FRAUD-ON-THE-MARKET DOCTRINE</u>**

36.    At all relevant times, the market for Tetraphase's securities was an efficient market for the following reasons, among others:

a)    Tetraphase securities met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b)    Tetraphase filed periodic public reports with the SEC and the NASDAQ; and

c)    Tetraphase regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

37.    As a result of the foregoing, the market for Tetraphase's securities promptly digested current information regarding Tetraphase from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of Tetraphase securities during the Class Period suffered similar injury through their purchase of Tetraphase securities at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

38.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Tetraphase who knew that the statement was false when made.

**CLASS ACTION ALLEGATIONS**

39.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Tetraphase securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

40.     The members of the Class are so numerous that joinder of all members is impracticable, since Tetraphase has millions of shares of stock outstanding and because the

Company's shares were actively traded on the NASDAQ.  As of August 1, 2015, Tetraphase had more than 36.4 million shares issued and outstanding. While the exact number of Class members in unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

41.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a)     whether the Exchange Act was violated by Defendants;

(b)      whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e)     whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f)     whether the price of Tetraphase securities was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages as a result of the decline in value of Tetraphase's stock when the truth was revealed, and if so, what is the appropriate measure of damages.

42.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

43.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

44.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**<u>CLAIMS FOR RELIEF</u>**

**COUNT I**
**Violation of Section 10(b) of**
**the Exchange Act and SEC Rule 10b-5**
**(Against All Defendants)**

45.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

46.     This Count is asserted by Plaintiff on behalf of themselves and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

47.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Tetraphase's common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Tetraphase's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

48.     Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for Tetraphase's common stock in violation of Section 10(b) of the Exchange Act and Rule 10-5.

49.     As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.  Defendants' material misrepresentations and omissions as set forth herein violated that duty.

50.     Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class.  Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

51.     As a result of Defendants' fraudulent activity, the market price of Tetraphase was artificially inflated during the Class Period.

52.     In ignorance of the true financial condition of Tetraphase, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Tetraphase containing the misleading information, purchased or otherwise acquired Tetraphase's common stock at artificially inflated prices during the Class Period.

53.     Plaintiff and the Class's losses were proximately caused by Defendants' active and primary participation in Tetraphase's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased Tetraphase's stock in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of Tetraphase's common stock through their misconduct as described herein. Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Tetraphase.

54.     Throughout the Class Period, Defendants were aware of material non-public information concerning Tetraphase fraudulent conduct (including the false and misleading statements described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

55.     As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Tetraphase common stock during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

56.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

57.     During the Class Period, the Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiff and other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

58.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

59.     The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Tetraphase's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, the Individual Defendants are responsible for the accuracy of Tetraphase's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

60.     The Individual Defendants acted as controlling persons of Tetraphase within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Tetraphase to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Tetraphase and all of its employees. As alleged above, Tetraphase is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

61.     As a direct and proximate result of the wrongful conduct of Tetraphase and the Individual Defendants, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

(A)    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and her counsel as Class counsel;

(B)    Awarding Plaintiff and the members of the Class damages, including interest;

(C)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees; and

(D)    Awarding such equitable/injunctive or other relief as the Court may deem just and proper

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  January 26, 2016                                   Respectfully submitted,


                                                          */s/Shannon L. Hopkins*
                                                          **LEVI & KORSINSKY LLP**
                                                          Shannon L. Hopkins (BBO# 657485)
                                                          shopkins@zlk.com
                                                          733 Summer Street, Suite 304
                                                          Stamford, Connecticut 06901
                                                          Tel.:  (203) 992-4523
                                                          Fax:  (212) 363-7171

                                                          *Counsel for Plaintiff*