**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

JOSEPH HARRINGTON, individually and on behalf of all others similarly situated,

Plaintiff,

v.

TETRAPHASE PHARMACEUTICALS INC., GUY MACDONALD, JOHN CRAIG THOMPSON, and DAVID LUBNER,

Defendants.

Civil Action No. 1:16-cv-10133-LTS

DAN SCHLAPKOHL, individually and on behalf of all others similarly situated,

Plaintiff,

v.

TETRAPHASE PHARMACEUTICALS INC., GUY MACDONALD, JOHN CRAIG THOMPSON, and DAVID LUBNER,

Defendants.

Civil Action No. 1:16-cv-10577-LTS

**AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS


SUMMARY OF THE ACTION ........ 1

JURISDICTION AND VENUE ........ 5

THE PARTIES ........ 6

I. LEAD PLAINTIFFS ........ 6

II. DEFENDANTS ........ 7

A. Tetraphase Pharmaceuticals, Inc. ........ 7

B. The Individual Defendants ........ 7

STATEMENT OF FACTS ........ 10

I. COMPANY BACKGROUND ........ 10

A. Tetraphase's Financial Viability Is Dependent on the Success of Its Main Drug Product -- Eravacycline ........ 10

B. Eravacycline's Physical and Chemical Properties Make It an Ineffective Oral Therapy for cUTIs ........ 11

1. Eravacycline is a Tetracycline Derivative Antibiotic ........ 11

2. Tetracyclines Are Not Recommended for the Treatment of cUTIs ........ 12

3. The Potential Value of an Oral Formulation to Tetraphase ........ 16

C. Tetraphase Secures Exclusive Rights to Eravacycline through a License Agreement with Harvard University ........ 18

II. TETRAPHASE ENTERS INTO THE BARDA CONTRACT AS ITS SOLE SOURCE OF FINANCING FOR ERAVACYCLINE ........ 18

III. EARLY ERAVACYCLINE CLINICAL TRIALS CONFIRM LOW EFFICACY IN TREATING cUTIs ........ 20

A. Tetraphase's IGNITE 1 Trial Top Line Results Reveal Low Urine Concentration and Bioavailability ........ 21

B. Tetraphase's IGNITE 2 Lead-In Trial Results Further Confirm Eravacycline Is Not an Effective Treatment of cUTIs ........ 23

C. Tetraphase Ignores Studies and Its Own Clinical Trial Results and Proceeds with the Pivotal Phase of IGNITE 2 ........ 27

IV. KNOWING THE PIVOTAL PHASE IS LIKELY TO FAIL, TETRAPHASE LAUNCHES STRATEGICALLY TIMED SECONDARY OFFERING TO SECURE ALTERNATIVE FINANCING FOR ERAVACYCLINE ........ 28

V. DEFENDANTS LEARN THE PIVOTAL IGNITE 2 TRIAL FAILED TO ACHIEVE ITS PRIMARY ENDPOINT BY AT LEAST APRIL 20, 2015 ........ 29

VI. TETRAPHASE ANNOUNCES FAILED PIVOTAL IGNITE 2 TRIAL RESULTS ON SEPTEMBER 8, 2015 ........ 30

DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS ........ 32

I. MATERIALLY FALSE AND MISLEADING STATEMENTS IN TETRAPHASE'S MARCH 5, 2015 PRESS RELEASE ........ 33

II. MATERIALLY FALSE AND MISLEADING STATEMENTS IN TETRAPHASE'S 2014 ANNUAL REPORT ........ 34

A. False and Misleading Statements Concerning the Efficacy of Eravacycline and its Use as a "First-Line" Therapy ........ 34

B. False and Misleading Statements Concerning Tetraphase's Ability to Submit a NDA to the FDA for Eravacycline ........ 36

C. False and Misleading Statements Concerning the Competitive Advantage and Commercial Market Eravacycline Would Enjoy ........ 39

D. False and Misleading Statements Concerning Tetraphase's Internal Controls ........ 40

III. MATERIALLY FALSE AND MISLEADING STATEMENTS IN TETRAPHASE'S APRIL 27, 2015 PRESS RELEASE ........ 43

IV. MATERIALLY FALSE AND MISLEADING STATEMENTS IN TETRAPHASE'S MAY 6, 2015 PRESS RELEASE ........ 44

V. MATERIALLY FALSE AND MISLEADING STATEMENTS IN TETRAPHASE'S MAY 7, 2015 10-Q ........ 46

A. False and Misleading Statements Concerning the Efficacy of Eravacycline and its Use as a "First-Line" Therapy ........ 46

B. False and Misleading Statements Concerning Tetraphase's Ability to Submit a NDA to the FDA for Eravacycline ........ 48

C. False and Misleading Statements Concerning the Competitive Advantage and Commercial Market Eravacycline Would Enjoy ........ 52

D. False and Misleading Statements Concerning Tetraphase's Internal Controls ........ 53

VI. MATERIALLY FALSE AND MISLEADING STATEMENTS IN TETRAPHASE'S AUGUST 5, 2015 PRESS RELEASE ........ 56

VII. MATERIALLY FALSE AND MISLEADING STATEMENTS IN TETRAPHASE'S AUGUST 5, 2015 EARNINGS CALL TRANSCRIPT ........ 57

VIII. MATERIALLY FALSE AND MISLEADING STATEMENTS IN TETRAPHASE'S AUGUST 8, 2015 10-Q ........ 58

A. False and Misleading Statements Concerning the Efficacy of Eravacycline and its Use as a "First-Line" Therapy ........ 58

B. False and Misleading Statements Concerning Tetraphase's Ability to Submit a NDA to the FDA for Eravacycline ........ 59

C. False and Misleading Statements Concerning the Competitive Advantage and Commercial Market Eravacycline Would Enjoy ........ 63

D. False and Misleading Statements Concerning Tetraphase's Internal Controls ........ 65

THE TRUTH IS REVEALED ........ 68

TETRAPHASE'S INTERNAL CONTROL VIOLATIONS ........ 70

ADDITIONAL SCIENTER ALLEGATIONS ........ 73

I. THE INDIVIDUAL DEFENDANTS' DIRECT KNOWLEDGE, AND/OR RECKLESS DISREGARD, THAT THE PIVOTAL IGNITE 2 TRIAL WOULD FAIL ........ 75

A. The Individual Defendants Were Aware That The IGNITE 2 Pivotal Trial Failed By at Least By April 20, 2015 Because They Were in Possession of the Final Trial Results ........ 75

B. Earlier Eravacycline Clinical Trials and Studies Demonstrated it Could Not Be Effective in Treating cUTIs Because of Low Urine Concentration and Bioavailability ........ 76

C. Defendants Knew the Pivotal IGNITE 2 Trial Would Fail Because Tetracycline Antibiotics Have Never Been Used To Treat cUTIs and Similar Drugs Have Failed ........ 76

D. The Individual Defendants Were Aware that Eravacycline Would Not Be Effective in Treating cUTIs as A Result of Constant Communications With the FDA ........ 77

E. The Individual Defendants Were Aware that Eravacycline Would Not Be Effective in Treating cUTIs as A Result of Monthly Reporting Requirements Under the BARDA Contract ........ 78

F. The Individual Defendants Knew the Pivotal IGNITE 2 Trial Was Failing Because The Clinical Development of Eravacycline is Tetraphase's "Core" Business ........ 80

G. The Individual Defendants Knew the Pivotal IGNITE 2 Trial Would Fail As A Result Of Their Unique Industry Knowledge And Experience ........ 81

H. The Curiously Timed Resignations of Individual Defendants Thompson and An Inference of Scienter ........ 83

II. THE INDIVIDUAL DEFENDANTS HAD MOTIVE TO MAKE FRAUDULENT REPRESENTATIONS ..... 84

A. The Individual Defendants Had Motive to Commit the Alleged Fraud to Sell Off Large Blocks of Their Personal Holdings of Tetraphase Common Stock ..... 84

1. Individual Defendant Thompson's Insider Sales ..... 84

2. Individual Defendant Macdonald's Insider Sales ..... 87

3. Individual Defendant Lubner's Insider Sales ..... 89

B. The Individual Defendants Had Motive to Commit the Alleged Fraud to Satisfy the Milestone Payments Under the License Agreement ..... 92

C. The Individual Defendants Had Motive to Commit the Alleged Fraud to Preserve BARDA Financing ..... 94

D. The Individual Defendants Had Motive to Commit the Alleged Fraud to Preserve Their Excessive Performance Bonuses ..... 95

E. The Individual Defendants Had Motive to Commit the Alleged Fraud to Complete the Secondary Offering and Secure Alternative Financing ..... 97

LOSS CAUSATION ..... 98

CLASS ACTION ALLEGATIONS ..... 100

NO STATUTORY SAFE HARBOR ..... 102

APPLICABILITY OF FRAUD ON THE MARKET DOCTRINE ..... 103

COUNT I ..... 104

COUNT II ..... 106

PRAYER FOR RELIEF ..... 108

JURY DEMAND ..... 108

Court-appointed Lead Plaintiffs Newvana Ventures Limited and Plymouth County Retirement System ("Plaintiffs"), bring this action pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), on behalf of all persons or entities other than Defendants (defined below) who purchased or otherwise acquired shares of Tetraphase Pharmaceuticals Inc. ("Tetraphase" or the "Company") common stock between March 5, 2015 and September 8, 2015, inclusive (the "Class Period").

Plaintiffs' information and beliefs, concerning matters other than themselves and their own acts, are based on the investigation of their undersigned Lead Counsel, which included, among other things, review and analysis of: (i) Tetraphase's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Tetraphase's other public statements, including press releases; (iii) information received from, or published by, the U.S. Food and Drug Administration ("FDA"); (iv) scientific reports concerning Tetraphase's clinical trials; (v) discussions with consulting experts; and (vi) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Tetraphase and the industry in which it operates. Lead Counsels' investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1. This securities fraud class action is predicated upon an extensive and pervasive fraud, orchestrated by the Defendants, who embarked upon a fraudulent scheme to force the Company's main drug candidate, Eravacycline, through a critical Phase 3 clinical trial as an

intravenous (IV) to oral transition therapy for the treatment of complicated urinary tract infections ("cUTIs"),[1] despite knowledge that Eravacycline, particularly when administered orally, could not effectively treat cUTIs and, thus, the trial would inevitably fail.

2. The Defendants perpetuated their fraudulent scheme by concealing the failed results from the pivotal Phase 3 IGNITE 2 trial from investors for ***more than four months*** while they personally profited from dumping large blocks of Tetraphase stock at artificially inflated prices before being forced to resign after announcing that Eravacycline failed to achieve its primary endpoint of statistical non-inferiority.

3. Eravacycline was being developed as a broad-spectrum IV to oral transition antibiotic to fight infections caused by drug-resistant Gram-negative bacteria, in a clinical development program referred to by the Company as "IGNITE." This program included two Phase 3 clinical trials: IGNITE 1 for the treatment of complicated intra-abdominal infections ("cIAIs"); and IGNITE 2 for the treatment of cUTIs. The IGNITE 2 Phase 3 clinical trial was a two-part clinical trial designed to assess the efficacy of Eravacycline compared with Levofloxacin, a currently approved broad-spectrum antibiotic for the treatment of cUTIs. The IGNITE 2 Phase 3 clinical trial was bifurcated into a "lead-in" portion and a "pivotal" portion.

---

[1] A cUTI is defined by the FDA as "a clinical syndrome characterized by pyuria and a documented microbial pathogen on culture of urine or blood, accompanied by local and systemic signs and symptoms, including fever (i.e., oral or tympanic temperature greater than 38 degrees Celsius), chills, malaise, flank pain, back pain, and/or costo-vertebral angle pain or tenderness, that occur[s] in the presence of a functional or anatomical abnormality of the urinary tract or in the presence of catheterization." *Guidance for Industry - Complicated Urinary Tract Infections: Developing Drugs for Treatment.* US Department of Health and Human Services, US Food and Drug Administration, Center for Drug Evaluation and Review *available at* *http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM070981.pdf* (accessed Jul. 24 2016).

4. Unbeknownst to investors, Eravacycline could never be used to treat cUTIs as an oral formulation. In fact, Eravacycline's physical and chemical properties make it impossible for it to reach the site of cUTIs in high enough concentrations to successfully treat the infection. Defendants' clinical trials of Eravacycline and prior third-party studies before the Class Period confirmed that the drug was ineffective in treating cUTIs when administered orally, and did not provide any basis for the massive gamble on the Phase 3 study of the drug as an oral formulation.

5. Despite this knowledge, throughout the Class Period, Defendants made numerous materially false and misleading statements and omitted material facts concerning the efficacy of Eravacycline, its ability to become a "first-line" therapy for the treatment of cUTIs, and attendant capacity for approval by both the FDA and the European Medicines Agency ("EMA"), including that Eravacycline:

- Will "become the drug of choice for first-line empiric treatment of a wide variety of serious and life-threatening infections";
- "[R]epresents a significant innovation in the creation of tetracycline drugs that has the potential to reinvigorate the clinical and market potential of the class";
- Will "be used to treat patients successfully in hospitals, emergency rooms and out-patient clinic settings";
- "[I]s active against multidrug-resistant bacteria in ways that tetracyclines currently on the market or in development are not";
- Will be a "safe and effective treatment for cUTIs and other serious and life-threatening infections for which we may develop eravacycline, such as hospital-acquired bacterial pneumonias"; and
- "[H]as the potential to be used as a first-line empiric monotherapy for the treatment of cUTIs, hospital-acquired bacterial pneumonias and other serious and life-threatening infections."

6. As set forth herein, Defendants' statements were materially false and misleading when made because, among other reasons: (i) Eravacycline's physical and chemical properties

prevent it from being an effective treatment for cUTIs; (ii) Eravacycline would never be successful as an oral therapy for cUTIs; (iii) Eravacycline would have a much more limited market than represented; (iv) the Company had materially overstated the potential efficacy of Eravacycline in the treatment of cUTIs and its business prospects; (v) as a result of (i) – (iv) above, Tetraphase's business prospects were far worse than represented; and (vii) the Company maintained inadequate internal controls.

7. Investors would ultimately learn the truth about the efficacy of Eravacycline on September 8, 2015 when, following the close of market, Tetraphase issued a press release announcing that Eravacycline, administered as an IV to oral transition therapy for the treatment of cUTIs, had failed to achieve its primary endpoint of statistical non-inferiority compared to Levofloxacin. Such news sent the Company's stock price careening downwards, from a closing share price of $44.78 on September 8, 2015 to a closing share price of $8.36 on September 10, 2015, ***a loss of more than 80% or $1.3 billion in market value***, on extremely heavy trading volume.

8. Defendants were aware that their statements concerning the efficacy and success of the Phase 3 IGNITE 2 pivotal trial were false and misleading at the time they were made because: (i) ***Defendants were in possession of the pivotal Phase 3 IGNITE 2 trial results in April 2015, more than four months before they publically announced the results***; (ii) prior third-party studies and clinical trials demonstrated the drug could not be effective in treating cUTIs; (iii) the bioavailability of Levofloxacin was 70% more favorable than Eravacycline in treating cUTIs; (iv) Defendants were admittedly in frequent communications with the FDA, during which they discussed the clinical trials; (v) other similar drug products have failed to prove efficacy in the same indication and, thus, development programs in this area have been abandoned; (vi)

Eravacycline is Tetraphase's "Core" product; and (v) Defendants have extensive industry knowledge and experience.

9. Moreover, Defendants were motivated to commit the alleged fraud to secure personal windfall profits through massive insider sales. In total, the Individual Defendants (as defined herein) collectively sold 243,086 shares of Tetraphase stock over the course of only four months during the Class Period for proceeds of approximately $10,517,964, all while in possession of material non-public information that the Phase 3 pivotal INGITE 2 trial had failed. As set forth further below, the Individual Defendants' insider sales were suspicious in timing and amount. For the six-month period prior to the Class Period, Defendants collectively sold 75,000 shares of Tetraphase stock, or ***70% less shares*** than they sold during the Class Period.

10. In addition, Defendants were motivated to commit the alleged fraud to: (i) obtain lucrative performance bonuses that were explicitly tied to Tetraphase achieving specific goals with respect to the clinical development of Eravacycline; (ii) keep critically-needed financing from the Company's sole source of revenue, that was expressly contingent on its progression through the clinical development of Eravacycline; and (iii) keep Tetraphase's exclusive license for Eravacycline, which was dependent on meeting continuing milestone obligations under a licensing agreement with Harvard University ("Harvard").

11. Plaintiffs seek to recover damages as a result of the alleged fraud.

## JURISDICTION AND VENUE

12. The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa. In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mails, interstate telephone communications and the facilities of the NASDAQ Global Select Market ("NASDAQ").

14. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. Tetraphase is headquartered in this District, with its principal place of business located at 480 Arsenal Street, Suite 110, Watertown, MA 02472.

## THE PARTIES

### I. LEAD PLAINTIFFS

16. Lead Plaintiff Newvana Ventures Limited, as previously set forth in its certification supporting its motion for appointment as Lead Plaintiff, incorporated by reference herein, purchased Tetraphase common stock at artificially inflated prices during the Class Period and has been damaged thereby.

17. Lead Plaintiff Plymouth County Retirement System, as previously set forth in its certification supporting its motion for appointment as Lead Plaintiff, incorporated by reference herein, purchased Tetraphase common stock at artificially inflated prices during the Class Period and has been damaged thereby.

## II. DEFENDANTS

### A. Tetraphase Pharmaceuticals, Inc.

18. Tetraphase is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Watertown, Massachusetts. Its common stock trades on the NASDAQ under the symbol "TTPH." The Company is a clinical stage biopharmaceutical company with a focus on creating antibiotics for drug-resistant bacteria. During the Class Period, Eravacycline was the Company's most important drug and the only drug candidate at the clinical trial stage. In the Company's Annual Report on Form 10-K, filed with the SEC on March 6, 2015 (the "2014 Annual Report"), Tetraphase touted the importance of Eravacycline's clinical success, stating: "[o]ur ability to become and remain profitable depends on our ability to generate revenue. We do not expect to generate significant revenue unless and until we obtain marketing approval for, and commercialize, Eravacycline."

### B. The Individual Defendants

19. Individual Defendant Guy Macdonald ("Macdonald") has been the President, Chief Executive Officer ("CEO"), and a member of the board of directors of Tetraphase, since January 2008. In the Company's SEC filings, Tetraphase noted the critical importance of Macdonald as CEO and President, by stating in relevant part: "[w]e believe that Mr. Macdonald's detailed knowledge of our company and his 25 year career in the global pharmaceutical and biotechnology industries, including his roles at Idenix Pharmaceuticals and Merck & Co., ***provides a critical contribution to our board of directors***." (Emphasis added).

20. Individual Defendant Macdonald participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning Tetraphase and its business, operations, growth, financial statements, and financial

condition. According to the Form S-1 Registration Statement, filed by the Company with the SEC on March 19, 2013 (the "Registration Statement") in anticipation of the Company's Initial Public Offering ("IPO"), the Company hinged its future success on its ability to retain Macdonald: "[o]ur industry has experienced a high rate of turnover of management personnel in recent years. We are ***highly dependent on the development, regulatory, commercialization and business development expertise of Guy Macdonald***, our President and Chief Executive Officer…." (Emphasis added). Moreover, because of his position of control and authority, his ability to exercise power and influence with respect to Tetraphase's course of conduct, and his access to material inside information about Tetraphase during the Class Period, at all material times, Individual Defendant Macdonald was a controlling person of Tetraphase within the meaning of § 20(a) of the Exchange Act. As alleged herein, during the Class Period, Macdonald made materially false and misleading statements concerning Tetraphase and the efficacy of Eravacycline.

21. Individual Defendant John Craig Thompson ("Thompson") was the Chief Operating Officer ("COO") of Tetraphase from February 4, 2014 to December 31, 2015. On December 21, 2015, following the announcement of the adverse pivotal IGNITE 2 trial results, the Company reported that Thompson had resigned from his position as COO, effective December 31, 2015.

22. According to the Company's SEC filings, Individual Defendant Thompson, as COO, was responsible for "leading Tetraphase's commercial operations, including business development and licensing, commercial planning and early marketing initiatives for ***eravacycline, Tetraphase's lead, late-stage antibiotic candidate***." (Emphasis added). Further, as stated in the Company's February 4, 2014 Press Release announcing Defendant Thompson's appointment as

COO, Thompson's qualifications were necessary for the development and production of Eravacycline:

> Craig is a talented and influential brand strategist ***with a wealth of experience in antibiotics, corporate strategy and operations***…. His proven abilities in the development and marketing of pharmaceutical products, combined with his strong business development, planning and leadership skills, ***strengthen Tetraphase's senior management team at an important time in the company's evolution***. We expect him ***to add significant value*** to the company as we work to maximize the ***global commercial potential for eravacycline*** through partnering and business development efforts and execute our commercial activities in preparation for a U.S. launch.

(Emphasis added). Because of his position of control and authority, his ability to exercise power and influence with respect to Tetraphase's course of conduct, and his access to material inside information about Tetraphase during the Class Period, at all material times, Individual Defendant Thompson was a controlling person of Tetraphase within the meaning of § 20(a) of the Exchange Act. As alleged herein, during the Class Period, Thompson made materially false and misleading statements concerning Tetraphase and the efficacy of Eravacycline.

23. Individual Defendant David Lubner ("Lubner") was the Chief Financial Officer ("CFO") and Senior Vice President of Tetraphase from October 2010 to January 8, 2016. Lubner was previously COO of Tetraphase from 2006 until October 2010. On January 4, 2016, following the adverse pivotal IGNITE 2 trial results, the Company announced that Lubner had resigned from his position as CFO on January 1, 2016, effective January 8, 2016. Individual Defendant Lubner directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning Tetraphase and its business, operations, growth, financial statements, and financial condition. Moreover, because of his position of control and authority, his ability to exercise power and influence with respect to Tetraphase's course of conduct, and his access to material inside information about Tetraphase

during the Class Period, at all material times, Individual Defendant Lubner was a controlling person of Tetraphase within the meaning of § 20(a) of the Exchange Act. As alleged herein, during the Class Period, Lubner made materially false and misleading statements concerning Tetraphase and the efficacy of Eravacycline.

24. Macdonald, Thompson, and Lubner are collectively referred to herein as the "Individual Defendants." Tetraphase and the Individual Defendants are collectively referred to herein as the "Defendants."

## STATEMENT OF FACTS

### I. COMPANY BACKGROUND

#### A. Tetraphase's Financial Viability Is Dependent on the Success of Its Main Drug Product -- Eravacycline

25. Tetraphase is a clinical stage biopharmaceutical company with a narrow focus on creating antibiotics for drug-resistant bacteria. According to the Company's 2014 Annual Report, as of February 28, 2015, Tetraphase had only 55 full-time employees, most of whom were engaged in research and development, and a market capitalization of approximately $152 million.

26. During the Class Period, Tetraphase had only one drug in clinical development -- Eravacycline -- currently being developed for the treatment cUTIs and cIAIs. As a clinical-stage Company with no approved drugs, and therefore no revenue, Tetraphase has acknowledged that its chances of success depend upon the ability of "our lead product candidate, eravacycline" and "our ability to develop, obtain marketing approval for and successfully commercialize eravacycline."

**B. Eravacycline's Physical and Chemical Properties Make It an Ineffective Oral Therapy for cUTIs**

**1. <u>Eravacycline is a Tetracycline Derivative Antibiotic</u>**

27. Potentially capable of treating a variety of bacterial infections, Eravacycline is considered a "broad-spectrum" antibiotic that falls within a family of antibiotics known as tetracyclines.[2] The general effectiveness of tetracyclines, combined with a lack of major adverse side effects from their use, made them a popular therapy for human and animal infections in the 1950s. While tetracyclines remain widely prescribed for animals today, their use in humans has dropped significantly over the last several decades as human pathogens have developed increasing resistance, which has rendered tetracycline antibiotics less effective as a treatment for humans. As a result, at present, tetracyclines comprise only 4% of the total volume of antibiotic sales for humans and the FDA has approved only one tetracycline antibiotic for commercialization in the past 30 years.[3]

28. Eravacycline was first discovered in the labs of Andrew G. Myers ("Myers"), chair of the chemistry department at Harvard. Myers was able to conceive a fully synthetic route to the development of tetracycline derivatives that significantly expanded the diversity of the compounds. According to the Company, all other tetracyclines on the market are produced semi-synthetically, first in bacteria and then modified in a limited number of ways by available chemistry. These conventional methods have only been able to produce tetracycline antibiotics with limited chemical diversity, making it difficult to create tetracycline antibiotics that address a

---

[2] Tetracyclines are a group of broad-spectrum antibiotics, originally discovered in the 1940s.

[3] *See e.g.*, *The Facts About Antibiotics in Livestock and Poultry Production*, NORTH AMERICAN MEAT INSTITUTE at https://www.meatinstitute.org/ht/display/ShowPage/id/102248/pid/102248 (accessed July 11, 2016).

wide variety of multidrug-resistant bacteria. By contrast, the fully synthetic process developed by Myers avoids the limitations of bacterially derived tetracyclines and creates a wider variety of tetracycline-based compounds than was previously possible.

29. Tetraphase targeted this fully synthetic technology to potentially develop a tetracycline antibiotic that would experience less resistance in human pathogens and thus, fill an unmet need for antibiotics that can treat multidrug-resistant bacteria that are no longer treatable by traditional tetracyclines.

### 2. <u>Tetracyclines Are Not Recommended for the Treatment of cUTIs</u>

30. There are two pharmacokinetic determinants of the effectiveness of an antibiotic in treating cUTIs – its urinary concentration and its bioavailability.[4] Urinary concentration refers to the amount of an active antibiotic that actually gets into the urine.[5] Bioavailability is the fraction of an antibiotic dose that reaches the bloodstream, from where it can then reach infected tissues.[6] By definition, when a medication is administered intravenously, its bioavailability is 100%. However, when a medication is administered via other routes (such as orally), its bioavailability is generally lower due to incomplete absorption, as well as metabolism, as it passes through the onslaught of the digestive system. This often leads to lower potency and, in turn, less efficacy.

31. Bioavailability is highly significant for the development of oral antibiotics in particular for three main reasons. First, enough of the drug must be absorbed from the

---

4 *See e.g.*, Sherwood L. Gorbach, John G. Bartlett, Neil R. Blacklow, *Infectious Diseases Third Edition*, Lippincott Williams & Wilkins (pub. 2004).

5 Sobel JD and Kaye D, Urinary Tract Infections. In: Bennett JE, Dolin R, Blaser MJ, eds., Mandell, Douglas, and Bennett's Principles and Practices of Infectious Diseases, 8th Ed. Philadelphia, PA: Saunders, 2015; chapter 74, pp. 776-813.

6 Holford NG. Pharmacokinetics and Pharmacodynamics: Rational Dosing & the Time Course of Drug Action. In: Katzung BG, Trevor AJ. eds. *Basic & Clinical Pharmacology,* 13th Ed. New York, NY: McGraw-Hill; 2015.

gastrointestinal ("GI") tract into the bloodstream and then into affected tissues in order for the antibiotic to effectively treat the infection. If the bulk of the antibiotic is not absorbed, then efficacy will be lower.[7] Second, if bioavailability is low, the drug sponsor may be required to increase the drug dose, which can lead to increased intolerability and adverse side effects.[8] And third, if bioavailability is low, a significant portion of the antibiotic will be left in the patient's GI tract to potentially disrupt the natural bacteria there. Disrupting this bacterial flora can at a minimum cause GI discomfort but at worst, can lead to additional infections.[9]

32. "[T]etracyclines have never been an established drug class for complicated urinary tract infections, [including] cUTIs."[10] This is because most tetracyclines are not eliminated through the urine and therefore do not achieve high concentrations in the urine.[11] With regard to oral administration, tetracyclines bind to calcium, inhibiting their absorption from the gastrointestinal tract and entry into the bloodstream.[12] In addition, the binding of antibiotics to proteins can further affect efficacy, since only an unbound antibiotic is capable of blocking bacterial growth.[13] The reported degree of protein binding is approximately 70% for tetracyclines.[14] This means that a limited amount of a tetracycline-class drug is actually available to successfully inhibit bacterial growth, thereby limiting the effectiveness of any tetracycline used

---

7 *Id.*

8 *Id.*

9 *Id.*

10 Dr. Harald Reinhart, *After ICAAC: Some More Thoughts on Eravacycline in cUTI and IGNITE-2*, ALLPHASE PHARMA CONSULTING, LLC at http://allphasepharma.com/dir/2015/09/24/1958/after-icaac-some-more-thoughts-on-eravacycline-in-cuti-and-ignite-2/ (accessed Jul. 18, 2016); *See also*, Moffa M and Brook I, Tetracyclines, Glycylcyclines, and Chloramphenicol. In: Bennett JE, *et al, op cit*. Ch. 26, pp. 326-338.

11 *Id.*

12 *Id.*

13 *Id.*

14 *Id.*

for the treatment of cUTIs. Accordingly, current professional society guidelines intended for medical practice do not recommend tetracyclines for the treatment of urinary tract infections, including cUTIs.[15]

33. Efforts to develop tetracyclines for the treatment of urinary tract infections have been swiftly abandoned by past drug sponsors due to efficacy concerns, particularly with respect to an oral formulation. For example, a program to develop Tigecycline, an antimicrobial closely related to Eravacycline for the treatment of cUTIs, was abandoned in 2005 due to low urine excretion rates and low levels of bioavailability. According to several studies, after intravenous administration of Tigecycline, only 33% of the dose was eliminated through urine, while 67% was rendered inactive or eliminated through other routes before even reaching the site of infection.[16] Thus, as one clinical review summarized:

> Although tigecycline has activity against ESBL-producing bacteria it is unstable in the urinary tract and thus ***is not a first-line antibiotic for treatment of these infections*** unless the source of the organisms is known to be a different site. Tigecycline has a large volume of distribution as evidenced by relatively low serum levels and ***is therefore not recommended for urinary tract-related bloodstream infection***.[17]

---

15 *See e.g.*, Hooton TM, Bradley SF, Cardenas DD, *et al.*, Infectious Diseases Society of America, *Diagnosis, prevention, and treatment of catheter-associated urinary tract infection in adults: 2009 International Clinical Practice Guidelines from the Infectious Diseases Society of America*, Clin Infect Dis. 2010 Mar 1 at 625-63; Gupta K, Hooton TM, Naber KG, *et al.*, Infectious Diseases Society of America; European Society for Microbiology and Infectious Diseases, *International clinical practice guidelines for the treatment of acute uncomplicated cystitis and pyelonephritis in women: A 2010 update by the Infectious Diseases Society of America and the European Society for Microbiology and Infectious Diseases*, Clin Infect Dis. 2011 Mar 1 at 103-20.

16 Daniel Curcio, *Treatment of Urosepsis with Tigecycline: a Pharmacological Perspective*, JOURNAL OF CLINICAL MICROBIOLOGY *available at* http://jcm.asm.org/content/46/5/1892.

17 Ann Pallett and Kieran Hand, *Complicated Urinary Tract Infections: Practical Solutions for the Treatment of Multiresistant Gram-Negative Bacteria*, JOURNAL OF ANTIMICROBIAL CHEMOTHERAPY *available at* http://jac.oxfordjournals.org/content/65/suppl_3/iii25.full.

(Emphasis added). Accordingly, the development of Tigecycline for the treatment of cUTIs was abandoned by Wyeth, a former pharmaceutical company purchased by Pfizer in 2009.[18] Notably, because of its low bioavailability, Tigecycline has never achieved necessary blood concentration levels to be administered orally for any indication.[19] Of further note, Tetraphase's Clinical Advisory Board includes the developer of Tigecycline, David Shlaes, MD, PhD.

34. As discussed below, Eravacycline has an even lower rate of elimination through urine than Tigecycline. While intravenously administered Tigecycline had an excretion rate in the urine of only 33%, Eravacycline is excreted through the urine at a rate of only 16% when administered intravenously.[20] Moreover, Eravacycline has a substantially lower bioavailability than most competitor drugs, including Levofloxacin, the control substance to which Eravacycline was compared in the IGNITE 2 pivotal trial. Indeed, Eravacycline has a bioavailability rate ***nearly 70% lower*** than Levofloxacin.[21]

35. Nevertheless, despite prior studies demonstrating low urine concentration and bioavailability in tetracyclines like Eravacycline, Tetraphase began clinical trials for Eravacycline in the United States under the supervision of the FDA in 2013 and in Europe under the supervision of the EMA in 2014. Regulatory procedures for conducting clinical trials on both continents are

---

[18] *Id.*

[19] Kerry S. Estes et al., *Comparison of the Pharmacokinetic Properties of Vancomycin, Linezolid, Tigecyline, and Daptomycin*, EUR J MED RES. 2010; 15(12): 533–543, *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3352102/ ("Tigecycline has almost no oral bioavailability. It is, therefore, administered as a short-term (30 – 60 min) intravenous infusion.")

[20] George G. Zhanel, et al., *Review of Eravacycline, a Novel Fluorocycline Antibacterial Agent* available at http://link.springer.com/article/10.1007/s40265-016-0545-8.

[21] Hooper DC, Strahilevitz J. Quinolones. In: Bennett JE, *et al., op. cit.* Chapter 34, pp. 419-39.

similar, in terms of how the trials are phased, what efficacy and safety criteria each phase tests for, and whether results from each phase justify progression to the next.[22]

### 3. The Potential Value of an Oral Formulation to Tetraphase

36. At present, there is a drastic need and attractive market for antibiotics that can be prescribed as an IV to oral transition therapy. The ability to switch from IV to oral therapy as soon as the patient is clinically stable reduces the length of hospitalization and consequently greatly reduces costs.[23] As the Company explained, "[m]any of the antibiotics that are most commonly used as first-line empiric monotherapies are only available in an IV formulation. ***Very few of the antibiotics that cover or are focused on the treatment of Gram-negative bacteria have oral dosage forms***." (Emphasis added).

37. According to several industry experts, the Company's development of an effective oral formulation of Eravacycline was critical to its ability to become a competitive player in the marketplace. For example, according to Dr. Harald Reinhart ("Dr. Reinhart"), the founder of Allphase Pharma Consulting, LLC, a twenty year veteran of the pharmaceutical industry, and a twenty-three year Clinical Professor of Infectious Diseases at Yale University School of Medicine, a purely IV formulation of eravacycline "will not make eravacycline successful in the market

---

22 *See generally*, *Guidance for Industry: E8 General Considerations for Clinical Trials*, US Department of Health and Human Services, US Food and Drug Administration, Center for Drug Evaluation and Review, *available at* http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM073132.pdf; *Guidance for Industry: E9 Statistical Principles for Clinical Trials*, US Department of Health and Human Services, US Food and Drug Administration, Center for Drug Evaluation and Review, *available at* http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM073137.pdf.

23 Noah S. Scheinfield, *Intravenous-to-Oral Switch Therapy*, MEDSCAPE at http://emedicine.medscape.com/article/237521-overview#a1 (accessed Jul. 18, 2016)

place."[24] Dr. Reinhart further stated that Tetraphase will not be a "competitive player in the large and lucrative cUTI arena" without an oral therapy because "[t]he profit potential [for Eravacycline] is severely reduced by the absence of IV/PO sequential therapy: this makes eravacycline much less competitive in cUTI, ABSSSI, CAP or any other f/u indication they choose to pursue."

38. Analysts reiterated a similar sentiment. In a November 17, 2015 analyst report by Alan Carr of Needham & Company LLC, Carr stated in response to Eravacycline's Phase 3 clinical failure:

> Tetraphase provided an update earlier today on its eravacycline program. The company has initiated discussions with the FDA to review results from completed Phase 3 trials in cIAI (met endpoints) and cUTI (missed endpoints). Tetraphase and the FDA, however, have not yet come to an agreement on development and regulatory path. The agency has requested additional data and more meetings are expected. Another update is expected in early 2016. Importantly, mgmt did confirm that the Phase 3 cUTI trial failed due to inadequate drug exposure from the oral formulation. Setting aside the oral formulation, the ideal outcome for Tetraphase is FDA agreement that an NDA submission for IV eravacycline in cUTI and cIAI is an appropriate next step. We believe the most likely outcome, however, is approval of the IV formulation only in cIAI, potentially around YE16. Regardless, ***we had viewed the oral formulation as an essential differentiating feature of eravacycline. Commercial potential of the IV formulation is somewhat modest in our opinion, whether approved in one or both target indications***.

(Emphasis added).

39. Accordingly, Tetraphase's success hinged not only on the successful development of Eravacycline but the ability to administer it as an oral therapy.

---

[24] Dr. Harald Reinhart, *Eravacycline Conference Call: Unrevealing and Disappointing*, ALLPHASE PHARMA CONSULTING, LLC (Nov. 23, 2015) at http://allphasepharma.com/dir/2015/11/23/2142/eravacycline-conference-call-unrevealing-and-disappointing/.

### C. Tetraphase Secures Exclusive Rights to Eravacycline through a License Agreement with Harvard University

40. Harvard granted Tetraphase the exclusive worldwide rights to develop Eravacycline pursuant to an August 3, 2006 license agreement (the "License Agreement"). In its public filings, Tetraphase touted the License Agreement as integral to the Company's future success:

> ***We believe that our proprietary chemistry technology, licensed from Harvard University on an exclusive worldwide basis and enhanced by us, represents a significant innovation in the creation of tetracycline drugs that has the potential to reinvigorate the clinical and market potential of the class***. Our proprietary chemistry technology makes it possible to create novel tetracycline antibiotics using a practical, fully synthetic process for what we believe is the first time…Using our proprietary chemistry technology, we can create a wider variety of tetracycline-based compounds than was previously possible, enabling us to pursue novel tetracycline derivatives for the treatment of multidrug-resistant bacteria that are resistant to existing tetracyclines and other classes of antibiotic products.

(Emphasis added).

41. The License Agreement contemplates that Tetraphase must successfully proceed through each phase of human clinical trials – including a "Phase III Clinical Trial" – and submit a New Drug Application ("NDA") to the FDA, within a specified time frame.[25] Failure to timely achieve these milestones constitutes a material breach of the License Agreement and provides Harvard with the "sole and exclusive remedy" to terminate the License Agreement and reassert its rights over Eravacycline.

## II. TETRAPHASE ENTERS INTO THE BARDA CONTRACT AS ITS SOLE SOURCE OF FINANCING FOR ERAVACYCLINE

42. Given the high costs of developing new antibiotics, passing clinical trials and obtaining regulatory approval, clinical biopharmaceutical companies must secure adequate

---

[25] The License Agreement was attached to the Registration Statement, filed by the Company with the SEC on March 19, 2013, and is redacted as to the specific timelines.

financing – which is particularly important for small, non-revenue producing companies like Tetraphase. To that end, Tetraphase announced in February 2012 that it had been awarded a financing contract by the Biomedical Advanced Research and Development Authority ("BARDA"), within the Office of the Assistant Secretary for Preparedness and Response in the U.S. Department of Health and Human Services, a small government agency that provides clinical funding for proposed new drugs that potentially address the public health and medical consequences of chemical, biological, radiological, and nuclear accidents (the "BARDA Contract"). According to the Company's 2014 Annual Report, the BARDA Contract is the Company's "only source of external funding," pursuant to which the Company has "derived all of [its] revenue to date."

43. The BARDA Contract provided committed financing of $11.5 million with the potential for additional financing if certain clinical milestones for Eravacycline are met in accordance with the timeline stipulated in the Integrated Master Schedule.[26] Under the BARDA Contract, the Company may receive a maximum award of approximately $67 million. The BARDA Contract has a five-year lifetime and expires on January 31, 2017. According to the Company's public filings, Tetraphase intended to use the BARDA financing "for the development, manufacturing and clinical evaluation of eravacycline to treat certain infections caused by life-threatening multidrug-resistant bacteria."

44. Both incremental and full financing under the BARDA Contract is contingent on the Company's ability to meet certain clinical development milestones within an abbreviated timeframe, which means that the Company *must* complete all clinical development milestones by

[26] The Integrated Master Schedule, which defines the tasks, their durations, and milestone completion dates, was attached to the Registration Statement, and is redacted as to the specific milestones and timelines.

the definitive performance deadline of January 31, 2017. If Tetraphase is unable to comply with the Integrated Master Schedule, it will not receive any additional financing from BARDA, and it must make do with the financing already committed under the BARDA Contract, or seek alternative sources of financing.

45. As such, the Company is dependent on continued financing under the BARDA Contract to fund its increasing research and development expenses, obligations to Harvard under the License Agreement, and intended clinical development, NDA for Eravacycline, and commercial launch of Eravacycline.

## III. EARLY ERAVACYCLINE CLINICAL TRIALS CONFIRM LOW EFFICACY IN TREATING cUTIs

46. On June 15, 2013, Tetraphase announced that the FDA had designated Eravacycline as a qualified infectious disease product ("QIDP") under the GAIN Act for the treatment of cIAIs and cUTIs. The QIDP designation meant that Eravacycline would receive priority review of a NDA submitted and become eligible for fast-track designation.[27]

47. The added benefit of priority review shortens the review period of an NDA submitted by the Company to the FDA from ten months to six months, expediting the commercialization process. The QIDP designation also made Eravacycline eligible for an additional five years of U.S. market exclusivity under the Hatch-Waxman Act.

48. On April 2, 2014, Tetraphase announced that the FDA had granted fast-track designation to Eravacycline for the treatment of cUTIs, for both the IV and oral formulations. In

---

[27] *Guidance for Industry: Expedited Programs for Serious Conditions – Drugs and Biologic,* US Department of Health and Human Services, US Food and Drug Administration, Center for Drug Evaluation and Review and Center for Biologic Evaluation and Review, *available at* http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm358301.pdf.

connection with its fast-track designation, the Company received substantial benefits in the form of frequent meetings with the FDA to discuss the drug's development, including early feedback on clinical trials, frequent written correspondence from the FDA regarding the ongoing clinical development of Eravacycline, and Rolling Review, which meant that Tetraphase could submit sections of its NDA for review by FDA as they were completed, rather than waiting until every section of the application was completed before the entire application could be reviewed.

49. As a result, the Company was in constant communication with the FDA regarding the clinical development of Eravacycline for the treatment of cUTIs throughout the IGNITE 2 trial. Indeed, in announcing the fast-track designation, Individual Defendant Macdonald specifically emphasized that the Company "look[ed] forward to working closely with the FDA as we continue to advance eravacycline through Phase 3 development."

### A. Tetraphase's IGNITE 1 Trial Top Line Results Reveal Low Urine Concentration and Bioavailability

50. On July 28, 2014, Tetraphase announced that it had completed patient enrollment for the IGNITE 1 Phase 3 clinical trial of Eravacycline for the treatment of cIAIs compared to ertapenem, a commonly available therapeutic. When a clinical trial is fully enrolled, this means every potential patient has been treated and the data is thereafter collected and analyzed. On December 17, 2014, Tetraphase announced positive top-line results from IGNITE 1, claiming Eravacycline had met its primary endpoint of statistical non-inferiority compared to ertapenem, under the guidance set by the FDA and the EMA. The Company failed to mention, however, that consistent with prior studies and similarly failed drugs for the treatment of cUTIs, the IGNITE 1 results revealed a low concentration of Eravacycline in the urine of 16% and a low bioavailability of 28% in the bloodstream after an oral dose.

51. As demonstrated in the chart below, Eravacycline's bioavailability rate of only 28% is extremely low when compared to other commercially available antibiotics, including those that the Company has previously identified in its public filings as comparable products or potential competitors:

| Drug | Bioavailability | Synopsis |
|---|---|---|
| Eravacycline | 28% | |
| Sivextro | 90% | Oxazolidinone-class antibacterial presently commercially available. |
| Fluconazole | 90% | Popular antifungal medication used to treat yeast infections. |
| Linezolid | 100% | Identified by the Company as a potential competitor. |
| Levofloxacin | 99% | Identified by the Company as a potential competitor and the control substance in the pivotal IGNITE 2 trial. |

52. Not surprisingly, and consistent with the IGNITE 1 trial results, third-party clinical studies and reviews have found that the bioavailability of Eravacycline is extremely low. For example, a 2014 study noted "***Oral bioavailability [in Eravacycline] is poor indicating that the future development of the drug must be driven to severe infections***."[28] Similarly, a February 2015 study found that Eravacycline can only be effective if dosed intravenously:

> Eravacycline is currently in phase 3 clinical studies for the IV./oral treatment of complicated urinary tract Infections (cUTI)…***Eravacycline has ~30% oral bioavailability in humans***; however, ***because of low oral bioavailability in***

[28] Juan Pablo Horcajada, et al., *Future Alternatives for the Treatment of Infections Caused by Carbapenemase-Producing Enterobacteriaceae: What is in the Pipeline?* Enfermedades Infecciosas y Microbiologia Clinica (pub. 2014).

> ***preclinical species used for toxicology and efficacy models (1 0), preclinical evaluations of Eravacycline required Intravenous administration.*** [29]

(Emphasis added).

Nevertheless, despite knowing in December 2014 that it was unlikely that Eravacycline could effectively treat cUTIs due to low concentrations in the urine and low bioavailability, Tetraphase forged ahead with the IGNITE 2 trial for the treatment of cUTIs.

### B. Tetraphase's IGNITE 2 Lead-In Trial Results Further Confirm Eravacycline Is Not an Effective Treatment of cUTIs

53. The Company conducted a Phase 3 clinical trial referred to as IGNITE 2 for the treatment of cUTIs. IGNITE 2 was a two-part, randomized, multi-center, double-blind, Phase 3 clinical trial designed to assess the efficacy of Eravacycline compared with Levofloxacin, which is heavily used in clinical practice for the treatment of cUTIs.

54. The Phase 3 clinical trial was bifurcated into a "lead-in" portion and a "pivotal phase." The lead-in portion of IGNITE 2 was designed to study the potential efficacy of Eravacycline and use clinical data to support selection of a drug-dosing regimen for the pivotal portion of the trial. The dosing regimen selected from the lead-in portion of IGNITE 2 as the most efficacious would be further tested in the pivotal IGNITE 2 to prove the efficacy of Eravacycline and, Defendants claimed, support the submission of a NDA to the FDA.

55. According to the Company's press release announcing enrollment of the trial, dated June 19, 2014, Phase 3 would include 120 patients in the lead-in portion and an additional 720 patients in the pivotal portion with trial locations in the U.S. and several EU countries. The FDA

[29] Trudy H. Grossman, et al., *Eravacycline (TP-434) Is Efficacious in Animal Models of Infection*, Antimicrobial Agents and Chemotherapy (pub online Feb. 17, 2015).

and the EMA both based their clinical analyses on the data gathered from this global trial. Patients in the trial were treated with a six to eight-day dosing regimen.[30]

56. The lead-in portion of the trial was initiated in December 2013 and patient enrollment was reportedly completed on June 19, 2014. In connection with U.S. oversight of the trial, a Clinical Advisory Board comprised of purportedly independent persons was established to provide guidance from clinical subject matter experts who advise the Company's clinical programs and oversee the clinical development process.[31] Notably, the Clinical Advisory Board includes the developer of Tigecycline, David Shlaes, MD, PhD.

57. Similarly, in connection with European oversight of the trial, a Data Monitoring Committee ("DMC") was established. The DMC is "a group of independent experts external to a study assessing the progress, safety data and, if needed critical efficacy endpoints of a clinical study."[32] In order to assess the efficacy endpoints, the DMC "may review ***unblinded study information*** (on a patient level or treatment group level) ***during the conduct of the study***" and "provide[] the sponsor with recommendations regarding study modification, continuation or termination."[33] (Emphasis added).

58. In the lead-in portion of IGNITE 2, the Company compared two different doses of Eravacycline to an active comparator, Levofloxacin. Specifically, approximately 120 patients randomized 1:1:1, received Eravacycline in one of two IV-to-oral step down dosing cohorts or

---

30 *See e.g.*, *Tetraphase Pharmaceuticals Announces Initiation of Pivotal Portion of IGNITE 2 Phase 3 Trial of Eravacycline in cUTI* (Oct. 6, 2014) at http://ir.tphase.com/releasedetail.cfm?releaseid=874763.

31 *See generally*, *Steering Committees & Clinical Advisory Boards*, Novella Clinical at http://novellaclinical.com/medical-device-trials/services/medical-device-steering-committees-clinical-advisory-boards/.

32 European Medicines Agency, *Guideline on Data Monitoring Committees* (Jul. 27, 2005) *available at* http://osp.od.nih.gov/sites/default/files/resources/WC500003635.pdf.

33 *Id.*

Levofloxacin, as follows: (i) 1.5 mg/kg IV of Eravacycline every 24 hours, followed by 200 mg oral every 12 hours; (ii) 1.5 mg/kg IV of Eravacycline every 24 hours, followed by 250 mg oral every 12 hours; or (iii) 750 mg IV of Levofloxacin every 24 hours, followed by 750 mg oral every 24 hours.

59. On September 2, 2014, Tetraphase announced the results of the lead-in portion of IGNITE 2, reporting purported positive first-line results where the IV-to-oral dosing regimen of Eravacycline (1.5 mg/kg IV followed by 200 mg oral dose) compared favorably to Levofloxacin. Specifically, the results showed that the IV-to-oral 200 mg dose of Eravacycline had a 70.8% response rate, as compared to a 64.3% response rate in the 250 mg dose, and a 52.2% response rate for Levofloxacin. The European trial results similarly reported results where the 200 mg oral dose of Eravacycline had a 75.0% response rate, as compared to a 64.3% response rate for the 250 mg dose, and a 56.5% response rate for Levofloxacin.[34]

60. The response rate measures the disappearance of all clinical evidence of a particular disease, and thus, is typically indicative of efficacy. Accordingly, the IGNITE 2 lead in trial showed that the ***lower 200 mg dose of Eravacycline was more effective than the higher dose of 250 mg***.

61. According to a former employee in the FDA's enforcement division ("CW1"), instances such as this where a *higher* dose is less effective indicates "an absence of dose response" and is a major indicator that "something was clearly wrong with the trial." Moreover, according to CW1, such results suggest the subject drug may lack efficacy. CW1 further stated that the

[34] While the EMA and the FDA base their clinical analyses on the same global trial, the endpoints they utilize in measuring efficacy differ slightly.

Company clearly rushed through the trials and should have conducted a more extensive analysis of the lead-in trial results before moving ahead to the pivotal portion of the IGNITE 2 trial.

62. Similarly, Dr. Reinhardt stated that this result does not make sense because drug efficacy in urinary tract infections is, as discussed previously, highly dependent on the ability of the drug to reach adequate concentrations in the urine.[35] Thus, a higher dose should result in higher urinary concentrations and higher response rates. It did not.

63. According to CW1, given these inconsistent and inexplicable results, it was critical for Defendants to adequately analyze the data before proceeding to the pivotal portion of the IGNITE 2 trial. Yet, on September 2, 2014, with apparently little time for analysis, Defendants announced "positive top-line results" from the lead-in phase and further announced that this data would allow the Company to move forward to the "pivotal phase" of the trial.

64. When announcing the top-line lead-in results in September 2014, the Company stated that it would be sharing the lead-in trial results and confirming the oral dose for the pivotal trial at an upcoming meeting with the FDA:

> Tetraphase plans to provide additional detail from the lead-in portion, and confirmation of the oral dose to be used in the pivotal portion, ***after sharing the data with the FDA, as previously agreed***. Tetraphase plans to present the full data from the lead-in portion of the IGNITE 2 Phase 3 trial at an upcoming scientific meeting.

(Emphasis added).

65. On October 6, 2014, in a press release entitled "Tetraphase Pharmaceuticals Announces Initiation of Pivotal Portion of Ignite 2 Phase 3 Trial of Eravacycline in CUTI," Tetraphase announced that it had begun enrolling patients for the pivotal portion of the Phase 3

---

[35] *Supra* note 10.

IGNITE 2 trial at the 200 mg dose. Thus, it is reasonable to infer that Defendants met with the FDA to discuss the IGNITE 2 trial sometime between September 2, and October 6, 2014.

66. Touting the results of the lead-in portion of IGNITE 2, Individual Defendant Macdonald stated in the October 6, 2014 press release:

> Initiation of the pivotal portion of the IGNITE 2 trial is an important milestone and we look forward to top-line data from the study in mid-2015. ***We believe eravacycline is a differentiated antibiotic candidate given its potential as an IV-to-oral transition therapy and its activity against a wide variety of bacterial pathogens, including multidrug-resistant Gram-negative bacteria***. IGNITE 2 is the second study in our IGNITE pivotal program, which also includes IGNITE 1, a Phase 3 clinical trial of an IV formulation of eravacycline in complicated intra-abdominal infections. We expect to announce top-line data from IGNITE 1 early in the first quarter of 2015.

(Emphasis added).

67. The October 6, 2014 press release failed to address the inconsistent and illogical trial results from the lead-in portion of IGNITE 2.

**C. Tetraphase Ignores Studies and Its Own Clinical Trial Results and Proceeds with the Pivotal Phase of IGNITE 2**

68. On October 6, 2014, Tetraphase announced that it was proceeding with the pivotal phase of IGNITE 2, despite Defendants' undisclosed knowledge that: (i) Eravacycline was excreted in the urine in even lower rates than Tigecycline when administered intravenously; (ii) Eravacycline has a bioavailability rate nearly 70% lower than Levofloxacin; (iii) Eravacycline had inadequate urine concentrations and bioavailability based on the Company's own clinical trials; (iv) highly inconsistent results from the lead-in portion of IGNITE 2 strongly suggested that the statements regarding the efficacy of Eravacycline in cUTIs were not scientifically supportable; and (v) Defendants had rushed their analysis and failed to properly analyze the lead-in trial data. Indeed, Defendants continued to tout Eravacycline throughout the Class Period in its public

statements as a "first-line empiric monotherapy for the treatment of cIAI and cUTI," and further extol the anticipated positive results of the pivotal phase of IGNITE 2.

69. The pivotal phase of IGNITE 2 was a non-inferiority, 10% margin study, which means that the trial would be deemed successful if it demonstrated a "worse-case" response rate no more than 10 percentage points lower than the response rate of Levofloxacin. A Phase 3 trial that tests for non-inferiority over clinical endpoints only needs to show that "the new drug is not materially worse than the control" or that the new drug "has at least some effect" or that it has an effect "that is not too much smaller than the active control."[36] In other words, Eravacycline could perform 10% *worse* than Levofloxacin and still be deemed a successful trial by the FDA.

## IV. KNOWING THE PIVOTAL PHASE IS LIKELY TO FAIL, TETRAPHASE LAUNCHES STRATEGICALLY TIMED SECONDARY OFFERING TO SECURE ALTERNATIVE FINANCING FOR ERAVACYCLINE

70. Defendants continued to reassure investors throughout the Class Period that the BARDA Contract – the Company's predominate source of financing – would be sufficient "to provide the funds to advance Eravacycline through enabling studies for a NDA, and to potentially support the development of Eravacycline for other indications." In reality, however, Defendants were aware that the BARDA Contract would either: (i) be terminated upon the forthcoming adverse pivotal IGNITE 2 trial results; or (ii) expire before the Company could re-conduct a phase 3 trial of Eravacycline for the treatment of cUTIs, when the pivotal IGNITE 2 trial inevitably failed. Accordingly, at the start of the Class Period, Defendants sought an alternative source of financing through a strategically timed Secondary Offering in March 2015.

[36] Carol M. Ashton, et al., *Comparative Effectiveness Research*, OXFORD UNIVERSITY PRESS (2013).

71. On March 11, 2015, Tetraphase announced the pricing of its Secondary Offering of 4.3 million shares of common stock at $35.00 per share, for a total offering size of $150 million.

72. Tetraphase filed its Offering Prospectus on Form 424B5 with the SEC on March 12, 2015 (the "Offering Prospectus"). According to the Offering Prospectus, Tetraphase planned to use the proceeds from the offering "to fund pre-commercialization activities and prepare for commercial launch of eravacycline."

73. In an effort to peddle its shares to unsuspecting investors, Defendants, in the Offering Prospectus, marketed the Company's products as a "significant innovation in the creation of tetracycline drugs that has the potential to reinvigorate the clinical and market potential of the class." The Offering Prospectus went on to tout Eravacycline's capacity for regulatory approval by stating, "we expect to submit a NDA to the FDA by the end of 2015 and a marketing authorization application to the European Medicines Agency in the first half of 2016."

74. Ultimately, Tetraphase raised proceeds of approximately $173.1 million from the sale of 4.945 million shares of common stock at $35.00 per share, before deducting the underwriter discount and commissions. The date the offering closed, on March 17, 2015, Tetraphase shares reached intraday trading levels of more than $40.00 per share.

## V. DEFENDANTS LEARN THE PIVOTAL IGNITE 2 TRIAL FAILED TO ACHIEVE ITS PRIMARY ENDPOINT BY AT LEAST APRIL 20, 2015

75. According to a May 6, 2015 press release, Tetraphase completed enrollment for the pivotal trial "recently." Moreover, according to the EU clinical Trials Register, Tetraphase completed the pivotal phase trial on April 20, 2015. Thus, Defendants likely had and concealed the top-line results from the pivotal trial ***at least five months before the IGNITE 2 phase 3 clinical trial results were publicly disclosed to investors,*** while they sold off large blocks of their personal

holdings of Tetraphase stock. In addition, it is likely that the Company received interim data from the European trials much earlier from the DMC's ongoing review of the data during the trial.

76. According to CW1, given Defendants' rapid analysis of the lead-in portion of IGNITE 2 of only approximately six weeks (June 19 - September 2, 2014), and given the imperative for Tetraphase to move quickly to analyze the pivotal data it would use to support its NDA slated for the fourth quarter of 2015, it is highly likely that Defendants moved even faster to analyze the pivotal trial data and had fully analyzed the results as early as May 2015.

77. If properly disclosed at this time, the top-line data would have revealed that Eravacycline had failed to meet its primary endpoints under the guidance established by both the FDA and the EMA. Instead, and as discussed further below, shortly after learning that the pivotal IGNITE 2 trial had failed, starting in May 2015, the Individual Defendants began dumping their personal holdings of Tetraphase stock.

## VI. TETRAPHASE ANNOUNCES FAILED PIVOTAL IGNITE 2 TRIAL RESULTS ON SEPTEMBER 8, 2015

78. On September 8, 2015, the last day of the Class Period, Tetraphase announced that the pivotal portion of IGNITE 2 had failed to meet its primary endpoint compared to Levofloxacin. The low-dose Eravacycline arm in the pivotal phase had a response rate that was ***as much as 14 percentage points worse than the response rate in the Levofloxacin comparator arm***. Thus, because the pivotal phase was structured as a non-inferiority, 10% margin study, the results came close to showing that Eravacycline was, in statistical terms, ***absolutely worse than Levofloxacin***.

79. Dr. Reinhart did not mince words when reacting to the adverse news of the pivotal IGNITE 2 trial, and further emphasized the importance of an oral formulation of Eravacycline to the Company's ability to be successful:

> ***We don't have an oral eravacycline formulation anymore!***

> There goes the prospect of any IV/PO sequential therapy, a sine-qua-non in a competitive market, and the analysts don't bat an eyelid. The investor community was told that the company wants to start a new cUTI study by mid-2016, this time as a purely IV treatment without PO step-down. ***This is a solution to satisfy the regulators and get you to an NDA, but it will not make eravacycline successful in the market place. With this approach all prospects of becoming a competitive player in the large and lucrative cUTI arena are now dismal***.
>
> ***
>
> The profit potential is severely reduced by the absence of IV/PO sequential therapy: this makes eravacycline much less competitive in cUTI, ABSSSI, CAP or any other f/u indication they choose to pursue.

(Emphasis added).[37]

80. While Defendants admit that they were in possession of the pivotal IGNITE 2 trial results about a week before this September 8 announcement (September 3-4, 2015), as discussed *supra* ¶ 75, Defendants were actually aware of them at least by April 20, 2015. Yet they concealed the results to allow the Individual Defendants to sell off massive amounts of their personal holdings of Tetraphase stock at a profit.

81. When the Company finally announced the results of its pivotal IGNITE 2 trial, the Tetraphase stock price plummeted by 80%, erasing $1.3 billion in market value. Accordingly, while Tetraphase investors suffered enormous losses, the Individual Defendants, who possessed material non-public information, reaped immense profits by disposing of significant portions of their holdings, at artificially inflated prices, over the course of the Class Period.

82. Illustrative of the Individual Defendants' willingness to trade on insider information, on September 8, 2015, hours before the announcement of the failed pivotal IGNITE 2 trial, Individual Defendant Thompson sold 10,000 shares of his personal holdings of Tetraphase stock at an average price of $44.08 per share, netting proceeds of $440,800. On December 15,

---

[37] *Supra* note 24.

2015, Thompson inexplicably resigned. Moreover, Individual Defendant Macdonald sold 10,000 shares at $41.57 per share for proceeds of $415,700 on September 1, 2015, just days before the announcement. As discussed further below, Defendants collectively sold 243,086 shares during the Class Period for proceeds of $10,517,964, with Individual Defendant Thompson selling 40% of his personal holdings over the course of these four months alone.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS

83. As alleged herein, prior to and throughout the Class Period, Defendants were in possession of clinical trial data and studies showing that Eravacycline lacked the pharmacokinetic properties to meet its statistical endpoint of non-inferiority when compared to Levofloxacin and, thus, the trial would ultimately fail. Moreover, at least as early as April 20, 2015, the trial was completed and the Individual Defendants knew that the trial had failed. Yet for the following four and a half months, the Individual Defendants concealed the truth that the trial had failed and continued to falsely assure investors that Eravacycline was positioned to be "the drug of choice" and a "first-line empiric monotherapy for the treatment of cIAI and cUTI" so they could dump large blocks of their personal holdings of Tetraphase stock.

84. These material misstatements and omissions created the false impression that the Company would ultimately announce positive top-line data from the pivotal IGNITE 2 trial, which would confirm the efficacy of Eravacycline, and support the successful filing of a NDA with the FDA by year-end 2015. This false impression caused the Company's stock price to be artificially inflated throughout the Class Period and, among other things, facilitated the Individual Defendants' massive insider sales.

85. As discussed below, throughout the Class Period, Defendants made material misstatements and omitted material facts concerning: (i) the efficacy of Eravacycline and its ability

to achieve status as a "first-line" treatment for cUTI and cIAI; (ii) the ability of the Company to submit a NDA to the FDA; and (iii) the competitive advantage and commercial market Eravacycline would enjoy when it was approved for commercialization.

## I. MATERIALLY FALSE AND MISLEADING STATEMENTS IN TETRAPHASE'S MARCH 5, 2015 PRESS RELEASE

86. On March 5, 2015, the first day of the Class Period, the Company issued a press release announcing its fourth quarter and full year 2014 financial results. Touting Eravacycline as the Company's "lead antibiotic candidate to treat bacterial infections," Individual Defendant Macdonald was quoted as stating:

> In 2014, Tetraphase made significant progress in the development of eravacycline, our lead antibiotic candidate to treat bacterial infections, including those caused by MDR Gram-negative bacteria…. We reported positive top-line results from IGNITE 1, a pivotal Phase 3 clinical trial, which met its primary endpoint of efficacy and safety of intravenous (IV) eravacycline in patients with complicated intra-abdominal infections (cIAI). ***Prior to that, we reported positive top-line results from the lead-in portion of IGNITE 2, our second pivotal Phase 3 clinical trial, which validated the activity and safety profile of IV-to-oral transition therapy in complicated urinary tract infections (cUTI)***. We look forward to reporting top-line results from the pivotal portion of IGNITE 2 mid-year and ***continue to target submission of a New Drug Application (NDA) for both indications by year end***.

(Emphasis added).

87. The above statements were materially false and misleading when made because: (i) Eravacycline's chemical properties made it an ineffective treatment for cUTIs; (ii) Eravacycline would never be successful as an oral therapy; (iii) the Company inappropriately rushed into the pivotal portion of the IGNITE 2 trial without properly analyzing the inconsistent and nonsensical dose response results of the lead-in portion of the trial; (iv) as a result of (i) – (iii) Eravacycline would never meet its primary endpoint of statistical non-inferiority compared to Levofloxacin and the Company would not be able to submit a NDA to the FDA within the time periods stated in their public filings, if ever; (v) Eravacycline would have a much more limited market than

represented; (vi) the Company had materially overstated the efficacy of Eravacycline and its business prospects; (vii) as a result of the above, Tetraphase's business prospects were far worse than represented; and (viii) the Company maintained inadequate internal controls.

## II. MATERIALLY FALSE AND MISLEADING STATEMENTS IN TETRAPHASE'S 2014 ANNUAL REPORT

88. On March 6, 2015, Tetraphase filed its 2014 Annual Report on Form 10-K with the SEC, which was signed and certified by Individual Defendants Macdonald and Lubner.

89. The 2014 Annual Report contained several categories of materially false and misleading statements concerning: (i) the efficacy of Eravacycline and its ability to achieve status as a "first-line" treatment for cUTI and cIAI; (ii) the ability of the Company to submit a NDA to the FDA; and (iii) the competitive advantage and commercial market Eravacycline would enjoy when it was approved for commercialization.

### A. False and Misleading Statements Concerning the Efficacy of Eravacycline and its Use as a "First-Line" Therapy

90. In the 2014 Annual Report, Defendants falsely represented that Eravacycline would be a "first-line" therapy:

- "We designed our Phase 3 program for eravacycline ***to enable us to position eravacycline as a first-line empiric monotherapy for the treatment*** of cIAI and cUTI due to eravacycline's broad-spectrum coverage of multidrug-resistant infections, including multidrug-resistant Gram-negative infections" and the Company's "goal is to develop eravacycline to be ***the drug of choice for first-line empiric treatment*** of a wide variety of serious and life-threatening infections." (Emphasis added).

- Tetraphase is developing Eravacycline "as a broad-spectrum IV and oral antibiotic for use as a ***first-line empiric monotherapy*** for the treatment of multidrug-resistant infections, including multidrug-resistant Gram-negative bacteria." (Emphasis added).

- Eravacycline is has the "potential to treat the majority of patients as a ***first-line empiric monotherapy*** with convenient dosing" and "potential for ***IV-to-oral transition therapy"***

(Emphasis added).

91. Moreover, the Individual Defendants falsely represented in the 2014 Annual Report that the results of the lead-in portion of IGNITE 2 were "positive" without disclosing that the lower 200 mg dose of Eravacycline was bizarrely more effective than the higher dose:

> In September 2014, we announced positive data from the lead-in portion of IGNITE 2, and in October 2014, we announced the selection of the oral dose to be evaluated in the pivotal portion of the trial and the initiation of patient enrollment. We expect to have top-line data from the Phase 3 cUTI clinical trial in mid-2015.

(Emphasis added).

92. In addition, in the 2014 Annual Report, the Individual Defendants also falsely represented the following regarding the efficacy of Eravacycline:

- In designing eravacycline, we inserted a fluorine atom into the tetracycline scaffold, which we call a fluorocycline, and modified the scaffold at another position. We believe that these modifications enable eravacycline to not be subject to tetracycline-specific mechanisms of drug resistance. ***As a result, we believe that eravacycline is active against multidrug-resistant bacteria in ways that tetracyclines currently on the market or in development are not.***

- [W]e believe that eravacycline shares a similar potency profile with carbapenems except that it more broadly covers Gram-positive pathogens like MRSA and enterococci, is active against carbapenem-resistant Gram-negative bacteria and, unlike carbapenems like Primaxin and Merrem, has reduced activity against Pseudomanas aeruginosa.

- We believe that the following key attributes of eravacycline, observed in clinical trials and preclinical studies, differentiate eravacycline from other antibiotics targeting multidrug-resistant infections, including multidrug-resistant Gram-negative infections. ***We believe these attributes will make eravacycline a safe and effective treatment for cIAI, cUTI and other serious and life-threatening infections for which we may develop eravacycline***, such as hospital-acquired bacterial pneumonias.

- **Convenient dosing regimen.** In our clinical trials to date, we have dosed eravacycline once or twice a day as a monotherapy. We believe that eravacycline will ***be able to be administered as a first-line empiric monotherapy with once- or twice-daily dosing, avoiding the need for complicated dosing regimens typical of***

***multi-drug cocktails and the increased risk of negative drug-drug interactions inherent to multi-drug cocktails.***

- **Potential for convenient IV-to-oral transition therapy.** In addition to the IV formulation of eravacycline, we have developed an oral formulation of eravacycline that we are evaluating in IGNITE 2. If successful, ***this oral formulation would enable patients who begin IV treatment with eravacycline in the hospital setting to transition to oral dosing of eravacycline either in hospital or upon patient discharge for convenient home-based care. We believe that the availability of both IV and oral transition therapy may reduce the length of a patient's hospital stay and the overall cost of care***.

(Emphasis added).

93. The above statements were materially false and misleading when made because: (i) Eravacycline's chemical properties made it an ineffective treatment for cUTIs; (ii) Eravacycline would never be successful as an oral therapy; (iii) the Company inappropriately rushed into the pivotal portion of the IGNITE 2 trial without properly analyzing the inconsistent and nonsensical dose response results of the lead-in portion of the trial; (iv) as a result of (i) – (iii) Eravacycline would never meet its primary endpoint of statistical non-inferiority compared to Levofloxacin and the Company would not be able to submit a NDA to the FDA within the time periods stated in their public filings, if ever; (v) Eravacycline would have a much more limited market than represented; (vi) the Company had materially overstated the efficacy of Eravacycline and its business prospects and, thus, it would ever be a "first-line" therapy for a majority of patients; (vii) as a result of the above, Tetraphase's business prospects were far worse than represented; and (viii) the Company maintained inadequate internal controls.

### B. False and Misleading Statements Concerning Tetraphase's Ability to Submit a NDA to the FDA for Eravacycline

94. In the 2014 Annual Report, Defendants falsely represented that, following the top-line data from the pivotal IGNITE 2 trial, the Company "expect[ed] to submit an NDA to the FDA by the end of 2015 and a [Marketing Authorization Application ("MAA")] to the EMA in the first

half of 2016." The 2014 Annual Report further represented with respect to the Company's development strategy:

> - ***Complete clinical development of eravacycline in its lead indications and seek regulatory approval.*** We have completed a Phase 3 clinical trial of the IV formulation of eravacycline in patients with cIAI. We are also conducting a global Phase 3 clinical trial of eravacycline for the treatment of cUTI, which we initiated in the first quarter of 2014. We announced top-line data from the Phase 3 cIAI clinical trial in December 2014, data from the lead-in portion of the Phase 3 cUTI clinical trial in September 2014 and expect to announce top-line data from the pivotal portion of the Phase 3 cUTI clinical trial in mid-2015. ***If we complete the pivotal portion of IGNITE 2 when we anticipate, and it is successful, we expect to submit an NDA to the FDA by the end of 2015 and an MAA to the EMA in the first half of 2016.***

(Emphasis in original).

95. The 2014 Annual Report also assured investors that the Company had sufficient funds to perform pre-commercialization activities for Eravacycline, thus implying to investors that regulatory approval was a done deal:

> We believe that our available funds will enable us to fund our current operating plan and capital expenditure requirements into at least the third quarter of 2016. ***We believe that our available funds will be sufficient to enable us to obtain top-line data from our ongoing Phase 3 clinical trial of eravacycline for the treatment of cUTI, submit a new drug application, or NDA, to the FDA for eravacycline and to perform pre-commercialization activities for eravacycline. We expect that these funds will not, however, be sufficient to enable us to commercially launch eravacycline.*** As a result, we will be required to obtain further funding through public or private equity offerings, debt financings, collaborations and licensing arrangements or other sources.

(Emphasis added).

96. The above statements were materially false and misleading when made because: (i) Defendants knew that Eravacycline was never going to meet its primary endpoint of statistical non-inferiority compared to Levofloxacin and, thus, the Company would not be able to submit a NDA to the FDA within the time periods stated in their public filings, if ever; (ii) Eravacycline would have a much more limited market than represented; (iii) the Company had materially

overstated the efficacy of Eravacycline and its business prospects; and (iv) as a result of the above, Tetraphase's business prospects were far worse than represented.

97. The 2014 Annual Report purported to warn investors regarding the potential that Eravacycline would not obtain regulatory approval through the successful submission of a NDA:

> We are dependent on the success of our lead product candidate, eravacycline, and our ability to develop, obtain marketing approval for and successfully commercialize eravacycline. If we are unable to develop, obtain marketing approval for and successfully commercialize eravacycline or experience significant delays in doing so, our business could be materially harmed.

98. Similarly, the 2014 Annual Report also purportedly warned that Eravacycline could fail to sufficiently establish efficacy, in which case the FDA would not approve any NDA submitted:

> ***If clinical trials of eravacycline or of any other product candidate that we advance to clinical trials fail to demonstrate safety and efficacy to the satisfaction of the FDA or comparable foreign regulatory authorities or do not otherwise produce favorable results, we may incur additional costs or experience delays in completing, or ultimately be unable to complete, the development and commercialization of eravacycline or any other product candidate***.
>
> ***
>
> The clinical development of eravacycline and other product candidates is susceptible to the risk of failure inherent at any stage of drug development, including failure to achieve efficacy in a trial or across a broad population of patients, the occurrence of severe adverse events, failure to comply with protocols or applicable regulatory requirements, and determination by the FDA or any comparable foreign regulatory authority that a drug product is not approvable. The outcome of preclinical studies and early clinical trials may not be predictive of the success of later clinical trials, and interim results of a clinical trial do not necessarily predict final results. ***For example, although eravacycline achieved favorable results in the lead-in part of our Phase 3 clinical trial in cUTI, we may nonetheless fail to achieve success in our Phase 3 clinical trial for eravacycline for the treatment of cUTI.***

(Emphasis added).

99. These purported warnings were materially false and misleading because, at the time that Defendants made these purported warnings, Tetraphase was in possession of clinical trial data

showing that Eravacycline lacked the pharmacokinetic properties to ever meet is statistical endpoint of non-inferiority when compared to Levofloxacin. Accordingly, the very risks Defendants were warning investors about had already materialized.

### C. False and Misleading Statements Concerning the Competitive Advantage and Commercial Market Eravacycline Would Enjoy

100. In the 2014 Annual Report, the Individual Defendants falsely represented that "[w]e are developing our lead product candidate, Eravacycline, a fully synthetic tetracycline derivative, as a broad-spectrum intravenous, or IV, and oral antibiotic for use as a ***first-line empiric monotherapy*** for the treatment of multidrug-resistant infections, including multidrug-resistant Gram-negative infections" and that:

> We believe our proprietary chemistry technology, licensed from Harvard University on an exclusive worldwide basis and enhanced by us, ***represents a significant innovation in the creation of tetracycline drugs that has the potential to reinvigorate the clinical and market potential of the class***. Our proprietary chemistry technology makes it possible to create novel tetracycline antibiotics ***using a practical, fully synthetic process for what we believe is the first time.*** This fully synthetic process avoids the limitations of bacterially-derived tetracyclines and allows us to chemically modify many positions in the tetracycline scaffold, including most of the positions that we believe could not practically be modified by any previous conventional method, which only allowed for limited chemical diversity. Using our proprietary chemistry technology, we can create a wider variety of tetracycline-based compounds than was previously possible, enabling us to pursue novel tetracycline derivatives for the treatment of multidrug-resistant bacteria that are resistant to existing tetracyclines and other classes of antibiotic products. To date, we have used our proprietary chemistry technology to create more than 3,000 new tetracycline derivatives that we believe could not be practically created with conventional methods. We own exclusive worldwide rights to these compounds and our technology.

(Emphasis added).

101. In the 2014 Annual Report, the Individual Defendants also touted the commercial viability of Eravacycline post-FDA approval, and the unique properties of Eravacycline which would insulate the drug from most competition:

- If eravacycline is approved, we intend to directly commercialize eravacycline in the United States with a targeted hospital sales force and to commercialize eravacycline outside the United States through collaboration arrangements. ***We believe that eravacycline's broad-spectrum coverage of multidrug-resistant Gram-negative bacteria and other multidrug-resistant bacteria, with the potential for IV-to-oral transition therapy, will allow it to be used to treat patients successfully in hospitals, emergency rooms and out-patient clinic settings.***

***

We believe that the ability of eravacycline to cover multidrug-resistant Gram-negative bacteria, as well as multidrug-resistant Gram-positive, anaerobic and atypical bacteria, and its potential for IV-to-oral transition therapy, will enable eravacycline to become the drug of choice for first-line empiric treatment of a wide variety of serious and life-threatening infections.

(Emphasis added).

102. The above statements were materially false and misleading when made because: (i) Eravacycline's chemical properties made it an ineffective treatment for cUTIs; (ii) Eravacycline would never be successful as an oral therapy; (iii) as a result of (i) – (ii) Eravacycline would never meet its primary endpoint of statistical non-inferiority compared to Levofloxacin, and the Company would not be able to submit a NDA to the FDA within the time periods stated in their public filings, if ever; (iv) Eravacycline would have a much more limited market than represented; (v) as a result of the above, Tetraphase's business prospects were far worse than represented; and (vi) the Company and its investors would never enjoy the benefits of an insulated, lucrative market from Eravacycline.

**D. False and Misleading Statements Concerning Tetraphase's Internal Controls**

103. Each of Tetraphase's annual and quarterly filings with the SEC included certifications signed by the Individual Defendants, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which represented that Tetraphase's financial statements did not contain material misstatements or omissions, and that the Company employed internal disclosure controls over financial reporting and related disclosures.

104. In this regard, the 2014 Annual Report contained a certification signed by Individual Defendant Macdonald, which stated:

**CERTIFICATION**

I, Guy Macdonald, certify that:

1. I have reviewed this Annual Report on Form 10-K of Tetraphase Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially

affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 6, 2015

/s/ Guy Macdonald
Guy Macdonald
Chief Executive Officer

105. The 2014 Annual Report contained a separate certification signed by Individual Defendant Lubner, which contained a verbatim reproduction of Macdonald's certification statement above.

106. Moreover, the 2014 Annual Report contained certifications pursuant to 18 U.S.C. Section 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, signed by Individual Defendant Macdonald, which stated:

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Tetraphase Pharmaceuticals, Inc. (the "Company") for the fiscal year ended December 31, 2014 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, Guy Macdonald,

Chief Executive Officer of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, that, to his knowledge on the date hereof:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 6, 2015

/s/ Guy Macdonald
Guy Macdonald
Chief Executive Officer

107. The 2014 Annual Report contained an identical certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed by Individual Defendant Lubner.

108. The above certifications were materially false and misleading at the time they were made because Tetraphase's internal controls were deficient and, thus, allowed the Company to: (i) continually misrepresent the ongoing clinical development status of Eravacycline and attendant capacity for approval by the EMA and FDA; (ii) engage in and perpetuate a massive insider selling scheme on behalf of the Individual Defendants; and (iii) violate the Company's own internal policies.

## III. MATERIALLY FALSE AND MISLEADING STATEMENTS IN TETRAPHASE'S APRIL 27, 2015 PRESS RELEASE

109. On April 27, 2015, the Company issued a press release announcing the first detailed results from the Phase 3 clinical trial of Eravacycline for the treatment of cUTIs. The data announced in the press release was presented at the 25th European Congress of Clinical Microbiology and Infectious Diseases (ECCMID), in Copenhagen, Denmark, on April 25 through

28, 2015. Touting the efficacy of Eravacycline and its ability to be an "IV-to-oral transition therapy," Individual Defendant Macdonald was quoted as stating:

> The detailed clinical data presented this year at ECCMID ***continues to support eravacycline's potential as a potent antibiotic option to treat both cIAI and cUTI infections.*** We believe that eravacycline will offer physicians additional options when treating bacterial infections given its activity against a wide variety of bacterial pathogens, including multidrug-resistant Gram-negative bacteria, and, in ***cUTI, its potential as an IV-to-oral transition therapy***. ***We are encouraged by the results achieved in both IGNITE1 (cIAI) and the lead-in portion of IGNITE2 (cUTI) and we look forward to reporting top-line results from the pivotal portion of IGNITE2 in mid-2015.***

(Emphasis added).

110. The above statements were materially false and misleading when made because: (i) Defendants were in possession of the failed results from the Phase 3 pivotal IGNITE 2 trial, at least by April 20, 2015 and, thus, knew Eravacycline would never be successful as an oral therapy; (ii) Eravacycline's chemical properties made it an ineffective treatment for cUTIs; (iii) Eravacycline would never be successful as an oral therapy; (iv) Eravacycline did not meet its primary endpoint of statistical non-inferiority compared to Levofloxacin and the Company would not be able to submit a NDA to the FDA within the time periods stated in their public filings, if ever; (v) Eravacycline would have a much more limited market than represented; (vi) the Company had materially overstated the efficacy of Eravacycline and its business prospects; and (vii) as a result of the above, Tetraphase's business prospects were far worse than represented.

## IV. MATERIALLY FALSE AND MISLEADING STATEMENTS IN TETRAPHASE'S MAY 6, 2015 PRESS RELEASE

111. On May 6, 2015, the Company issued a press release announcing financial results for the first quarter of 2015. Touting the efficacy of Eravacycline, its ability to be an "IV-to-oral transition therapy," and the Company's planned NDA filing and launch of Eravacycline, Individual Defendant Macdonald was quoted as stating:

> ***We've had a strong start to 2015, setting the stage for what we believe will be a very productive year for the company***. Last month, we presented detailed results from IGNITE1, our pivotal phase 3 clinical trial, which met its primary endpoint of efficacy and safety of intravenous (IV) eravacycline in patients with complicated intra-abdominal infections (cIAI). We are also pleased to announce that we recently completed patient enrollment in the pivotal portion of IGNITE2, our second phase 3 clinical trial of eravacycline for the treatment of complicated urinary tract infections (cUTI). Following the requisite protocol-specified follow-up visits and database lock activities we expect top-line data from IGNITE2 to be available in the third quarter of 2015, ***and are targeting a submission of our New Drug Application (NDA) for both IV and oral formulations in cIAI and cUTI by year-end 2015.*** We were also pleased to have raised an additional $173 million through a public offering which will ***allow us to prepare for commercial launch of eravacycline.***

(Emphasis added).

112. The press release further represented that the results of the lead-in portion of IGNITE 2 were "favorable" without noting the contradictory, nonsensical results that the lead-in portion of the trial had produced:

> Detailed results from the lead-in portion of IGNITE2, ***the Company's pivotal phase 3 clinical trial evaluating the safety and efficacy of eravacycline for the treatment of cUTI. Both IV-to-oral dosing regimens of eravacycline (1.5 mg/kg IV followed by 200 mg or 250 mg) compared favorably to levofloxacin for the treatment of cUTI, supporting the advancement of the trial into its pivotal portion***. Based on the results from the lead-in portion of the trial, the Company selected the 200 mg eravacycline oral dose for the pivotal portion of the phase 3 trial that is currently underway.

(Emphasis added).

113. The above statements were materially false and misleading when made because: (i) Defendants were in possession of the failed results from the Phase 3 pivotal IGNITE 2 trial, at least by April 20, 2015 and, thus, knew Eravacycline would never be successful as an oral therapy; (ii) Eravacycline's chemical properties made it an ineffective treatment for cUTIs; (iii) Eravacycline would never be successful as an oral therapy; (iv) Eravacycline did not meet its primary endpoint of statistical non-inferiority compared to Levofloxacin and the Company would

not be able to submit a NDA to the FDA within the time periods stated in their public filings, if ever; and (v) the Company inappropriately rushed into the pivotal portion of the IGNITE 2 trial without properly analyzing the inconsistent and nonsensical dose response results of the lead-in portion of the trial.

114. The above material misstatements served to maintain the Company's inflated stock price. Indeed, as a result of the above misstatements, Tetraphase stock price increased 13% from $35.78 per share on May 5, 2015 to $40.50 per share on May 8, 2015.

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS IN TETRAPHASE'S MAY 7, 2015 10-Q

115. On May 7, 2015, Tetraphase filed its quarterly report for the first quarter of 2015 on Form 10-Q for the period ended March 31, 2015 ("2015 First Quarter Report") with the SEC, which was signed and certified by Individual Defendants Macdonald and Lubner.

116. The 2015 First Quarter Report contained several categories of materially false and misleading statements relating to: (i) the efficacy of Eravacycline and its ability to achieve status as a "first-line" treatment for cUTI and cIAI; (ii) the ability of the Company to submit a NDA to the FDA; and (iii) the competitive advantage and commercial market Eravacycline would enjoy when it was approved for commercialization

### A. False and Misleading Statements Concerning the Efficacy of Eravacycline and its Use as a "First-Line" Therapy

117. In the 2015 First Quarter Report, Defendants falsely represented that the Company was developing Eravacycline "for use as a ***first-line empiric monotherapy for the treatment of multidrug-resistant infections, including multidrug-resistant Gram-negative infections***" and further, that eravacycline was being developed as "as a broad-spectrum intravenous, or IV, and oral antibiotic." (Emphasis added).

118. In addition, the Individual Defendants purportedly warned investors of the risks it faced if Eravacycline was unsuccessful:

> ***If clinical trials of eravacycline or of any other product candidate that we advance to clinical trials fail to demonstrate safety and efficacy to the satisfaction of the FDA or comparable foreign regulatory authorities or do not otherwise produce favorable results, we may incur additional costs or experience delays in completing, or ultimately be unable to complete, the development and commercialization of eravacycline or any other product candidate.***
>
> We are not permitted to commercialize, market, promote, or sell any product candidate in the United States without obtaining marketing approval from the FDA or in other countries without obtaining approvals from comparable foreign regulatory authorities, such as the EMA, ***and we may never receive such approvals. We must complete extensive preclinical development and clinical trials to demonstrate the safety and efficacy of our product candidates in humans before we will be able to obtain these approvals***. Clinical testing is expensive, difficult to design and implement, can take many years to complete and is inherently uncertain as to outcome. We have not previously submitted an NDA to the FDA or similar drug approval filings to comparable foreign regulatory authorities for any of our product candidates.
>
> ***The clinical development of eravacycline and other product candidates is susceptible to the risk of failure inherent at any stage of drug development, including failure to achieve efficacy in a trial*** or across a broad population of patients, the occurrence of severe adverse events, failure to comply with protocols or applicable regulatory requirements, and determination by the FDA or any comparable foreign regulatory authority that a drug product is not approvable. The outcome of preclinical studies and early clinical trials may not be predictive of the success of later clinical trials, and interim results of a clinical trial do not necessarily predict final results. ***For example, although eravacycline achieved favorable results in the lead-in part of our phase 3 clinical trial in cUTI, we may nonetheless fail to achieve success in our phase 3 clinical trial for eravacycline for the treatment of cUTI.***

(Emphasis added).

119. The above statements were materially false and misleading when made because: (i) Defendants were in possession of the failed results from the Phase 3 pivotal IGNITE 2 trial, at least by April 20, 2015 and, thus, knew Eravacycline would never be successful as an oral therapy; (ii) Eravacycline's chemical properties made it an ineffective treatment for cUTIs; (iii) Eravacycline would never be successful as an oral therapy; (iv) Eravacycline did not meet its

primary endpoint of statistical non-inferiority compared to Levofloxacin, and the Company would not be able to submit a NDA to the FDA within the time periods stated in their public filings, if ever; (v) Eravacycline would have a much more limited market than represented; (vi) the Company had materially overstated the efficacy of Eravacycline and its business prospects; and (vii) as a result of the above, Tetraphase's business prospects were far worse than represented. Accordingly, the purported risks of which Defendants warned had already materialized.

**B. False and Misleading Statements Concerning Tetraphase's Ability to Submit a NDA to the FDA for Eravacycline**

120. In the 2015 First Quarter Report, Defendants falsely represented that, following the top-line data from the pivotal IGNITE 2 trial, the Company "expect[ed] that positive results from these two phase 3 clinical trials ***will be sufficient to support submission of a new drug application, or NDA, for eravacycline in the treatment of cIAI and cUTI***." (Emphasis added).

121. The 2015 First Quarter Report further represented with respect to the Company's development strategy:

> In December 2014, we announced positive top-line data from IGNITE1, and in April 2015, we announced additional positive data from the trial. In September 2014, we announced positive data from the lead-in portion of IGNITE2, and in October 2014 announced the selection of the oral dose for the IV-to-oral transition therapy (1.5 mg/kg IV followed by 200 mg oral dose) to be evaluated in the pivotal portion of IGNITE2 and the initiation of patient enrollment. We completed enrollment of the pivotal portion of IGNITE2 in May 2015 and we expect to have top-line data in the third quarter of 2015. If the pivotal portion of IGNITE2 is successful, ***we expect to submit an NDA to the FDA by the end of 2015 and a marketing authorization application, or MAA, to the European Medicines Agency, or EMA, in the first half of 2016.***

(Emphasis added).

122. The 2015 First Quarter Report also assured investors that the Company had sufficient funds to perform pre-commercialization activities for Eravacycline, thus implying to investors that regulatory approval was a done deal:

> We believe that our available funds at March 31, 2015 will be sufficient to enable us to obtain top-line data from our ongoing Phase 3 clinical trial of eravacycline for the treatment of cUTI, to submit an NDA to the FDA for eravacycline and a MAA to the EMA, to perform pre-commercialization activities and prepare for commercial launch of eravacycline. We expect that these funds will not, however, be sufficient to enable us to commercially launch eravacycline. It is also possible that we will not achieve the progress that we expect with respect to eravacycline because the actual costs and timing of clinical development activities are difficult to predict and are subject to substantial risks and delays. We will be required to obtain further funding through public or private equity offerings, debt financings, collaborations and licensing arrangements or other sources. Adequate additional financing may not be available to us on acceptable terms, or at all. Our failure to raise capital as and when needed would have a negative impact on our financial condition and our ability to pursue our business strategy.

(Emphasis added).

123. The above statements were materially false and misleading when made because: (i) Defendants knew that Eravacycline was never going to meet its primary endpoint of statistical non-inferiority compared to Levofloxacin and, thus, the Company would not be able to submit a NDA to the FDA within the time periods stated in their public filings, if ever; (ii) Eravacycline would have a much more limited market than represented; (iii) the Company had materially overstated the efficacy of Eravacycline and its business prospects; and (iv) as a result of the above, Tetraphase's business prospects were far worse than represented.

124. The 2015 First Quarter Report purported to warn investors regarding the potential that Eravacycline would not obtain regulatory approval through the successful submission of a NDA, stating in relevant part: "[w]e may never succeed in achieving regulatory approval for eravacycline or any of our other product candidates."

125. Similarly, the 2015 First Quarter Report also purportedly warned that Eravacycline could fail to sufficiently establish efficacy, in which case the FDA would not approve any NDA submitted:

> ***Risks Related to Product Development and Commercialization***

> ***We are dependent on the success of our lead product candidate, eravacycline, and our ability to develop, obtain marketing approval for and successfully commercialize eravacycline. If we are unable to develop, obtain marketing approval for and successfully commercialize eravacycline or experience significant delays in doing so, our business could be materially harmed.***
>
> We currently have no products approved for sale and have invested a significant portion of our efforts and financial resources in the development of eravacycline for ***use as a first-line empiric monotherapy for the treatment of multidrug-resistant infections.*** Our prospects are substantially dependent on our ability to develop, obtain marketing approval for and successfully commercialize eravacycline. The success of eravacycline will depend on several factors, including the following: successful completion of clinical trials; successful manufacturing of registration batches for regulatory filings for eravacycline; the successful outcome of discussions with regulatory agencies regarding our planned marketing applications timely filing for and receipt of marketing approvals from applicable regulatory authorities; commercial launch of eravacycline, if and when approved, whether alone or in collaboration with others; a continued acceptable safety profile of eravacycline following approval.
>
> Successful development of eravacycline for additional indications, including hospital-acquired bacterial pneumonias and other serious and life-threatening infections, will be subject to these same risks.
>
> If we are unable to develop, receive marketing approval for, or successfully commercialize eravacycline, or experience delays as a result of any of these matters or otherwise, our business could be materially harmed.

(Emphasis added).

126. Finally, and again, the 2015 First Quarter Report purportedly warned of the possibility that Eravacycline would not be eligible for regulatory approval:

> **Risks Related to Regulatory Approval and Other Legal Compliance Matters**
>
> ***If we are not able to obtain, or if there are delays in obtaining, required regulatory approvals, we will not be able to commercialize eravacycline or any other product candidate that we develop, and our ability to generate revenue will be materially impaired.***
>
> Our product candidates, including eravacycline, and the activities associated with their development and commercialization, including their design, testing, manufacture, safety, efficacy, recordkeeping, labeling, storage, approval,

advertising, promotion, sale and distribution, are subject to comprehensive regulation by the FDA and other regulatory agencies in the United States and by comparable foreign regulatory authorities, with regulations differing from country to country. ***Failure to obtain marketing approval for a product candidate will prevent us from commercializing the product candidate.*** We currently do not have any products approved for sale in any jurisdiction. We have only limited experience in filing and supporting the applications necessary to gain marketing approvals and expect to rely on third-party contract research organizations to assist us in this process.

We are not permitted to market our product candidates in the United States until we receive approval of an NDA from the FDA. We have not submitted an NDA for any of our product candidates. ***An NDA must include extensive preclinical and clinical data and supporting information to establish the product candidate's safety and efficacy for each desired indication. The NDA must also include significant information regarding the chemistry, manufacturing and controls for the product candidate. Obtaining approval of an NDA is a lengthy, expensive and uncertain process. The FDA review process typically takes years to complete. The FDA has substantial discretion in the approval process and may refuse to accept for filing any application or may decide that our data are insufficient for approval and require additional preclinical, clinical or other studies.*** Foreign regulatory authorities have differing requirements for approval of drug candidates with which we must comply prior to marketing. Obtaining marketing approval for marketing of a product candidate in one country does not ensure that we will be able to obtain marketing approval in other countries, but the failure to obtain marketing approval in one jurisdiction could negatively impact our ability to obtain marketing approval in other jurisdictions. Delays in approvals or rejections of marketing applications in the United States or foreign countries may be based upon many factors, including regulatory requests for additional analyses, reports, data and studies, regulatory questions regarding, or different interpretations of, data and results, changes in regulatory policy during the period of product development and the emergence of new information regarding product candidates or related products. ***The FDA or other regulatory authorities may determine that eravacycline or any other product candidate that we develop is not effective,*** or is only moderately effective, or has undesirable or unintended side effects, toxicities, safety profile or other characteristics ***that preclude marketing approval or prevent or limit commercial use.*** In addition, any marketing approval we ultimately obtain may be limited or subject to restrictions or post-approval commitments that render the approved product not commercially viable. ***If we experience delays in obtaining approval or if we fail to obtain approval of eravacycline or any other product candidate that we develop, the commercial prospects for eravacycline or such other product***

> ***candidate may be harmed and our ability to generate revenues will be materially impaired.***

(Emphasis added).

127. The above statements were materially false and misleading when made because: (i) Defendants were in possession of the failed results from the Phase 3 pivotal IGNITE 2 trial, at least by April 20, 2015 and, thus, knew Eravacycline would never be successful as an oral therapy; (ii) Eravacycline did not meet its primary endpoint of statistical non-inferiority compared to Levofloxacin and the Company would not be able to submit a NDA to the FDA within the time periods stated in their public filings, if ever; (iii) the Company had materially overstated the efficacy of Eravacycline and its business prospects; and (vii) as a result of the above, Tetraphase's business prospects were far worse than represented. Accordingly, the very risks Defendants were warning investors about had already materialized.

### C. False and Misleading Statements Concerning the Competitive Advantage and Commercial Market Eravacycline Would Enjoy

128. In the 2015 First Quarter Report, the Individual Defendants made the following false warnings regarding the development and commercialization of Eravacycline:

> ***We may be unable to develop and commercialize eravacycline or any other product candidate*** and, even if we do, may never achieve profitability. Even if we do achieve profitability, we may not be able to sustain or increase profitability on a quarterly or annual basis. Our failure to become and remain profitable would decrease the value of our company and could impair our ability to raise capital, expand our business or continue our operations. A decline in the value of our company could cause our stockholders to lose all or part of their investment in us.

(Emphasis added).

129. The above statements were materially false and misleading at the time they were made because, (i) the Company would not be able to submit a NDA to the FDA within the time periods stated in their public filings, if ever; (ii) Eravacycline would never be a "first-line" therapy

or a "drug of choice"; and (iii) as a result of the foregoing, the Company and its investors would never enjoy the benefits of an insulated, lucrative market from Eravacycline.

**D. False and Misleading Statements Concerning Tetraphase's Internal Controls**

130. Each of Tetraphase's annual and quarterly filings with the SEC included certifications signed by the Individual Defendants, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which represented that Tetraphase's financial statements did not contain material misstatements or omissions, and that the Company employed internal disclosure controls over financial reporting and related disclosures.

131. In this regard, the 2015 First Quarter Report contained a certification signed by Individual Defendant Macdonald, which stated:

**Certification of Chief Executive Officer**
**pursuant to Rules 13a-14(a) or 15d-14(a) of the Securities Exchange Act of 1934,**
**as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Guy Macdonald, certify that:

(1) I have reviewed this quarterly report on Form 10-Q of Tetraphase Pharmaceuticals, Inc.;

(2) Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3) Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects, the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4) The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5) The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 7, 2015

/s/ Guy Macdonald
Guy Macdonald
Chief Executive Officer (Principal Executive Officer)

132. The 2015 First Quarter Report contained a separate certification signed by Individual Defendant Lubner, which contained a verbatim reproduction of Macdonald's certification statement above.

133. Moreover, the 2015 First Quarter Report contained certifications pursuant to 18 U.S.C. Section 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, signed by Individual Defendant Macdonald, which stated:

**Certification of Chief Executive Officer**
**pursuant to 18 U.S.C. Section 1350, as adopted**
**pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the quarterly report on Form 10-Q of Tetraphase Pharmaceuticals, Inc. (the "Company") for the period ended March 31, 2015, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Guy Macdonald, as Chief Executive Officer of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of his knowledge:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: May 7, 2015

/s/ Guy Macdonald
Guy Macdonald
Chief Executive Officer

134. The 2015 First Quarter Report contained an identical certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed by Individual Defendant Lubner.

135. The above certifications were materially false and misleading at the time they were made because Tetraphase's internal controls were deficient and, thus, allowed the Company to: (i)

continually misrepresent the ongoing clinical development status of Eravacycline and attendant capacity for approval by the EMA and FDA; (ii) engage in and perpetuate a massive insider selling scheme on behalf of the Individual Defendants; and (iii) violate the Company's own internal policies.

136. In addition, the above material misstatements served to maintain the Company's inflated stock price. Indeed, as a result of the above misstatements, Tetraphase stock price increased 13% from $35.78 per share on May 5, 2015 to $40.50 per share on May 8, 2015.

## VI. MATERIALLY FALSE AND MISLEADING STATEMENTS IN TETRAPHASE'S AUGUST 5, 2015 PRESS RELEASE

137. On August 5, 2015, the Company issued a press release announcing financial results for the second quarter of 2015. Touting the clinical development of Eravacycline, and its attendant capacity for approval by the FDA, Individual Defendant Macdonald was quoted as stating:

> ***We made significant progress against our 2015 objectives in the second quarter.*** We reported detailed positive results from IGNITE1, the Company's pivotal phase 3 clinical trial evaluating the safety and efficacy of eravacycline for the treatment of complicated intra-abdominal infections (cIAI) at ECCMID 2015, and completed enrollment in the pivotal portion of IGNITE2, our second phase 3 clinical trial of eravacycline for the treatment of complicated urinary tract infections (cUTI). ***We look forward to receiving the results from the pivotal portion of IGNITE2*** and remain on track to report the top-line data this quarter.

(Emphasis added).

138. Moreover, the press release purported to warn investors of certain risks related to the clinical development of Eravacycline, including the following:

> [W]hether results obtained in preclinical studies and early or interim clinical trials will be indicative of results obtained in future clinical trials; whether eravacycline will advance through the clinical trial process on a timely basis; whether the results of the Company's development efforts will warrant regulatory submission and whether any such submissions will receive approval from the United States Food and Drug Administration or equivalent foreign regulatory agencies; whether, if

> eravacycline obtains approval, it will be successfully distributed and marketed; [and] whether our cash resources will be sufficient to fund our continuing operations for the period anticipated.

139. The above statements were materially false and misleading when made because: (i) Defendants were in possession of the failed results from the Phase 3 pivotal IGNITE 2 trial, at least by April 20, 2015 and, thus, knew Eravacycline would never be successful as an oral therapy; (ii) Eravacycline did not meet its primary endpoint of statistical non-inferiority compared to Levofloxacin, and the Company would not be able to submit a NDA to the FDA within the time periods stated in their public filings, if ever; (iii) the Company had materially overstated the efficacy of Eravacycline and its business prospects; and (vii) as a result of the above, Tetraphase's business prospects were far worse than represented. Accordingly, the very risks Defendants were warning investors about had already materialized.

## VII. MATERIALLY FALSE AND MISLEADING STATEMENTS IN TETRAPHASE'S AUGUST 5, 2015 EARNINGS CALL TRANSCRIPT

140. Also on August 5, 2015, the Company held an earnings call to discuss the recently announced financial results for the second quarter of 2015. Touting the clinical development of Eravacycline, and its attendant capacity for approval by the FDA, Individual Defendant Macdonald was again quoted as stating:

> In the second quarter ***we made significant progress against our 2015 objectives***. In April, at ECCMID, the European anti-infectives meeting, we reported detailed positive results from IGNITE1, our pivotal Phase 3 clinical trial evaluating the safety and efficacy of eravacycline for the treatment of complicated intra-abdominal infections, as well as ***detailed positive data from the lead-in portion of IGNITE2, our second Phase 3 clinical trial of eravacycline for the treatment of complicated urinary tract infections.*** In May, we completed enrollment in the pivotal portion of IGNITE2 and we remain on track to announce top-line data this quarter.
>
> ***
>
> [Our] plan right now on our current timeline is to have approval and to launch towards the end of next year.

(Emphasis added)

141. The above statements were materially false and misleading when made because: (i) Defendants were in possession of the failed results from the Phase 3 pivotal IGNITE 2 trial, at least by April 20, 2015 and, thus, knew Eravacycline would never be successful as an oral therapy; (ii) Eravacycline did not meet its primary endpoint of statistical non-inferiority compared to Levofloxacin and the Company would not be able to submit a NDA to the FDA within the time periods stated in their public filings, if ever; (iii) the Company had materially overstated the efficacy of Eravacycline and its business prospects; and (vii) as a result of the above, Tetraphase's business prospects were far worse than represented.

## VIII. MATERIALLY FALSE AND MISLEADING STATEMENTS IN TETRAPHASE'S AUGUST 8, 2015 10-Q

142. On August 8, 2015, Tetraphase filed its quarterly report for the second quarter of 2015 on Form 10-Q for the period ended June 30, 2015 ("2015 Second Quarter Report") with the SEC, which was signed and certified by Individual Defendants Macdonald and Lubner.

143. The 2015 Second Quarter Report contained several categories of materially false and misleading statements relating to: (i) the efficacy of Eravacycline and its ability to achieve status as a "first-line" treatment for cUTI and cIAI; (ii) the ability of the Company to submit a NDA to the FDA; and (iii) the competitive advantage and commercial market Eravacycline would enjoy when it was approved for commercialization.

### A. False and Misleading Statements Concerning the Efficacy of Eravacycline and its Use as a "First-Line" Therapy

144. In the 2015 Second Quarter Report, Defendants falsely represented that the Company was developing Eravacycline "for use as a ***first-line empiric monotherapy for the treatment of multidrug-resistant infections***, including multidrug-resistant Gram-negative

infections" and further, that Eravacycline was being developed as "as a broad-spectrum intravenous, or IV, and oral antibiotic." (Emphasis added).

145. The above statements were materially false and misleading when made because: (i) Defendants were in possession of the failed results from the Phase 3 pivotal IGNITE 2 trial, at least by April 20, 2015 and, thus, knew Eravacycline would never be successful as an oral therapy; (ii) Eravacycline's chemical properties made it an ineffective treatment for cUTIs; (iii) Eravacycline would never be successful as an oral therapy; (iv) Eravacycline did not meet its primary endpoint of statistical non-inferiority compared to Levofloxacin, and the Company would not be able to submit a NDA to the FDA within the time periods stated in their public filings, if ever; (v) Eravacycline would have a much more limited market than represented; (vi) the Company had materially overstated the efficacy of Eravacycline and its business prospects; and (vii) as a result of the above, Tetraphase's business prospects were far worse than represented.

**B. False and Misleading Statements Concerning Tetraphase's Ability to Submit a NDA to the FDA for Eravacycline**

146. In the 2015 Second Quarter Report, Defendants falsely represented that, following the top-line data from the pivotal IGNITE 2 trial, the Company "expect[ed] that positive results from these two phase 3 clinical trials ***will be sufficient to support submission of a new drug application, or NDA, for eravacycline in the treatment of cIAI and cUTI***." (Emphasis added).

147. The 2015 Second Quarter Report further represented with respect to the Company's development strategy:

> In December 2014, the Company announced positive top-line data from IGNITE1, and in April 2015, the Company announced additional positive data from the trial. In September 2014, the Company announced positive data from the lead-in portion of IGNITE2, and in October 2014, the Company announced the selection of the oral dose for the IV-to-oral transition therapy (1.5 mg/kg IV followed by 200 mg oral dose) to be evaluated in the pivotal portion of IGNITE2 and the initiation of patient enrollment. The Company completed enrollment of the pivotal portion of

> IGNITE2 in May 2015 and the Company expects to have top-line data in the third quarter of 2015.
>
> As is customary, the Company has had and will continue to have several pre-NDA discussions with the FDA regarding the Company's NDA submission. Depending on the outcome of the FDA discussions and the pivotal portion of IGNITE2, the Company expects to submit an NDA to the FDA by the end of 2015 and a marketing authorization application to the European Medicines Agency in the first half of 2016. The Company is also pursuing the discovery and development of additional antibiotics that target unmet medical needs, including multidrug-resistant Gram-negative bacteria.
>
> ***
>
> Other than the government funding described above, we do not expect to receive any revenue from any product candidates that we develop, including eravacycline, ***until we obtain regulatory approval and commercialize such products, which we do not expect will occur before 2016, or until we potentially enter into collaborative agreements with third parties for the development and commercialization of such product candidates.***

(Emphasis added).

148. The above statements were materially false and misleading when made because: (i) Defendants were in possession of the failed results from the Phase 3 pivotal IGNITE 2 trial, at least by April 20, 2015 and, thus, knew Eravacycline would never be successful as an oral therapy; (ii) Eravacycline's chemical properties made it an ineffective treatment for cUTIs; (iii) Eravacycline would never be successful as an oral therapy; (iv) Eravacycline did not meet its primary endpoint of statistical non-inferiority compared to Levofloxacin, and the Company would not be able to submit a NDA to the FDA within the time periods stated in their public filings, if ever; (v) Eravacycline would have a much more limited market than represented; (vi) the Company had materially overstated the efficacy of Eravacycline and its business prospects; and (vii) as a result of the above, Tetraphase's business prospects were far worse than represented.

149. The 2015 Second Quarter Report purported to warn investors regarding the potential that Eravacycline would not obtain regulatory approval through the successful submission of a NDA, stating is relevant part:

> If we are not able to obtain, or if there are delays in obtaining, required regulatory approvals, we will not be able to commercialize eravacycline or any other product candidate that we develop, and our ability to generate revenue will be materially impaired.
>
> Our product candidates, including eravacycline, and the activities associated with their development and commercialization, including their design, testing, manufacture, safety, efficacy, recordkeeping, labeling, storage, approval, advertising, promotion, sale and distribution, are subject to comprehensive regulation by the FDA and other regulatory agencies in the United States and by comparable foreign regulatory authorities, with regulations differing from country to country. Failure to obtain marketing approval for a product candidate will prevent us from commercializing the product candidate. We currently do not have any products approved for sale in any jurisdiction. We have only limited experience in filing and supporting the applications necessary to gain marketing approvals and expect to rely on third-party contract research organizations to assist us in this process.
>
> We are not permitted to market our product candidates in the United States until we receive approval of an NDA from the FDA. We have not submitted an NDA for any of our product candidates. ***An NDA must include extensive preclinical and clinical data and supporting information to establish the product candidate's safety and efficacy for each desired indication. The NDA must also include significant information regarding the chemistry, manufacturing and controls for the product candidate. Obtaining approval of an NDA is a lengthy, expensive and uncertain process. The FDA review process typically takes years to complete. The FDA has substantial discretion in the approval process and may refuse to accept for filing any application or may decide that our data are insufficient for approval and require additional preclinical, clinical or other studies or additional information regarding chemistry, manufacturing and controls for the product candidate***. Foreign regulatory authorities have differing requirements for approval of drug candidates with which we must comply prior to marketing. Obtaining marketing approval for marketing of a product candidate in one country does not ensure that we will be able to obtain marketing approval in other countries, but the failure to obtain marketing approval in one jurisdiction could negatively impact our ability to obtain marketing approval in other jurisdictions. Delays in approvals or rejections of marketing applications in the United States or foreign countries may be based upon many factors, including regulatory requests for additional analyses, reports, data and studies, regulatory questions regarding, or different interpretations of, data and results, changes in regulatory policy during the period of product

> development and the emergence of new information regarding product candidates or related products. ***The FDA or other regulatory authorities may determine that eravacycline or any other product candidate that we develop is not effective***, or is only moderately effective, or has undesirable or unintended side effects, toxicities, safety profile or other characteristics ***that preclude marketing approval or prevent or limit commercial use***. In addition, any marketing approval we ultimately obtain may be limited or subject to restrictions or post-approval commitments that render the approved product not commercially viable. ***If we experience delays in obtaining approval or if we fail to obtain approval of eravacycline or any other product candidate that we develop, the commercial prospects for eravacycline or such other product candidate may be harmed and our ability to generate revenues will be materially impaired***.

(Emphasis added).

150. Similarly, the 2015 Second Quarter Report also purportedly warned that Eravacycline could fail to sufficiently establish efficacy, in which case the FDA would not approve any NDA submitted:

> If clinical trials of eravacycline or of any other product candidate that we advance to clinical trials fail to demonstrate safety and efficacy to the satisfaction of the FDA or comparable foreign regulatory authorities or do not otherwise produce favorable results, we may incur additional costs or experience delays in completing, or ultimately be unable to complete, the development and commercialization of eravacycline or any other product candidate.
>
> We are not permitted to commercialize, market, promote, or sell any product candidate in the United States without obtaining marketing approval from the FDA or in other countries without obtaining approvals from comparable foreign regulatory authorities, such as the EMA, and we may never receive such approvals. We must complete extensive preclinical development and clinical trials to demonstrate the safety and efficacy of our product candidates in humans before we will be able to obtain these approvals. Clinical testing is expensive, difficult to design and implement, can take many years to complete and is inherently uncertain as to outcome. We have not previously submitted an NDA to the FDA or similar drug approval filings to comparable foreign regulatory authorities for any of our product candidates.
>
> The clinical development of eravacycline and other product candidates is susceptible to the risk of failure inherent at any stage of drug development, including failure to achieve efficacy in a trial or across a broad population of patients, the occurrence of severe adverse events, failure to comply with protocols or applicable regulatory requirements, and determination by the FDA or any comparable foreign regulatory authority that a drug product is not approvable. The outcome of preclinical studies and early clinical trials may not be predictive of the

> success of later clinical trials, and interim results of a clinical trial do not necessarily predict final results. ***For example, although eravacycline achieved favorable results in the lead-in part of our phase 3 clinical trial in cUTI, we may nonetheless fail to achieve success in our phase 3 clinical trial for eravacycline for the treatment of cUTI.***

(Emphasis added).

151. The above statements were materially false and misleading when made because: (i) Defendants were in possession of the failed results from the Phase 3 pivotal IGNITE 2 trial, at least by April 20, 2015 and, thus, knew Eravacycline would never be successful as an oral therapy; (ii) Eravacycline did not meet its primary endpoint of statistical non-inferiority compared to Levofloxacin, and the Company would not be able to submit a NDA to the FDA within the time periods stated in their public filings, if ever; (iii) the Company had materially overstated the efficacy of Eravacycline and its business prospects; and (vii) as a result of the above, Tetraphase's business prospects were far worse than represented. Accordingly, the very risks Defendants were warning investors about had already materialized.

### C. False and Misleading Statements Concerning the Competitive Advantage and Commercial Market Eravacycline Would Enjoy

152. In the 2015 Second Quarter Report, the Individual Defendants made the following false warnings regarding the development and commercialization of Eravacycline:

> Our ability to become and remain profitable depends on our ability to generate revenue. We do not expect to generate significant revenue unless and until we obtain marketing approval for, and commercialize, eravacycline, which will require us to be successful in a range of challenging activities, including: conducting and successfully completing our phase 3 clinical trial of eravacycline for the treatment of cUTI; ***applying for and obtaining marketing approval for eravacycline; protecting and maintaining our rights to our intellectual property portfolio related to eravacycline; contracting for the manufacture of commercial quantities of eravacycline; and establishing sales, marketing and distribution capabilities to effectively market and sell eravacycline***.
>
> Because of the numerous risks and uncertainties associated with pharmaceutical product development, we are unable to accurately predict the timing or amount of increased expenses or when, or if, we will be able to achieve profitability. Our

> expenses could increase if we are required by the United States Food and Drug Administration, or FDA, or the European Medicines Agency, or EMA, to perform clinical and non-clinical studies in addition to those currently expected, or if there are any delays in completing our clinical trials, the development of any of our product candidates or the manufacture of any of our product candidates.
>
> ***We may be unable to develop and commercialize eravacycline or any other product candidate*** and, even if we do, may never achieve profitability. Even if we do achieve profitability, we may not be able to sustain or increase profitability on a quarterly or annual basis. Our failure to become and remain profitable would decrease the value of our company and could impair our ability to raise capital, expand our business or continue our operations. A decline in the value of our company could cause our stockholders to lose all or part of their investment in us.

(Emphasis added).

153. The 2015 Second Quarter Report also purported to further warn:

> We are dependent on the success of our lead product candidate, eravacycline, and our ability to develop, obtain marketing approval for and successfully commercialize eravacycline. If we are unable to develop, obtain marketing approval for and successfully commercialize eravacycline or experience significant delays in doing so, our business could be materially harmed.
>
> We currently have no products approved for sale and have invested a significant portion of our efforts and financial resources in the development of eravacycline for use as a first-line empiric monotherapy for the treatment of multidrug-resistant infections. ***Our prospects are substantially dependent on our ability to develop, obtain marketing approval for and successfully commercialize eravacycline***. The success of eravacycline will depend on several factors, including the following: successful completion of clinical trials; successful manufacturing of registration batches for regulatory filings for eravacycline; the successful outcome of discussions with regulatory agencies regarding our planned marketing applications; timely filing for and receipt of marketing approvals from applicable regulatory authorities; establishment of arrangements with third-party manufacturers to obtain manufacturing supply; obtainment and maintenance of patent and trade secret protection and regulatory exclusivity; protection of our rights in our intellectual property portfolio; successful manufacturing of commercial scale batches of eravacycline; ***commercial launch of eravacycline***, if and when approved, whether alone or in collaboration with others; acceptance of eravacycline, if and when approved, by patients, the medical community and third-party payors; competition with other therapies; and a continued acceptable safety profile of eravacycline following approval.
>
> Successful development of eravacycline for additional indications, including hospital-acquired bacterial pneumonias and other serious and life-threatening infections, will be subject to these same risks.

> If we are unable to develop, receive marketing approval for, or successfully commercialize eravacycline, or experience delays as a result of any of these matters or otherwise, our business could be materially harmed.

(Emphasis added).

154. The above statements were materially false and misleading at the time they were made because, (i) the Company would not be able to submit a NDA to the FDA within the time periods stated in their public filings, if ever; (ii) Eravacycline would never be a "first-line" therapy or a "drug of choice"; and (iii) as a result of the foregoing, the Company and its investors would never enjoy the benefits of an insulated, lucrative market from Eravacycline.

**D. False and Misleading Statements Concerning Tetraphase's Internal Controls**

155. Each of Tetraphase's annual and quarterly filings with the SEC included certifications signed by the Individual Defendants, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which represented that Tetraphase's financial statements did not contain material misstatements or omissions, and that the Company employed internal disclosure controls over financial reporting and related disclosures.

156. In this regard, the 2015 Second Quarter Report contained a certification signed by Individual Defendant Macdonald, which stated:

**Certification of Chief Executive Officer**
**pursuant to Rules 13a-14(a) or 15d-14(a) of the Securities Exchange Act of 1934,**
**as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Guy Macdonald, certify that:

(1) I have reviewed this quarterly report on Form 10-Q of Tetraphase Pharmaceuticals, Inc.;

(2) Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3) Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects, the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4) The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5) The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 6, 2015

/s/ Guy Macdonald
Guy Macdonald
Chief Executive Officer (Principal
Executive Officer)

157. The 2015 Second Quarter Report contained a separate certification signed by Individual Defendant Lubner, which contained a substantively identical reproduction of Macdonald's certification statement above.

158. Moreover, the 2015 Second Quarter Report contained certifications pursuant to 18 U.S.C. Section 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, signed by Individual Defendant Macdonald, which stated:

**Certification of Chief Executive Officer**
**pursuant to 18 U.S.C. Section 1350, as adopted**
**pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the quarterly report on Form 10-Q of Tetraphase Pharmaceuticals, Inc. (the "Company") for the period ended June 30, 2015, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Guy Macdonald, as Chief Executive Officer of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of his knowledge:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: August 6, 2015

/s/ Guy Macdonald
Guy Macdonald
Chief Executive Officer

159. The 2015 Second Quarter Report contained an identical certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed by Individual Defendant Lubner.

160. The above certifications were materially false and misleading at the time they were made because Tetraphase's internal controls were deficient and, thus, allowed the Company to: (i) continually misrepresent the ongoing clinical development status of Eravacycline and attendant capacity for approval by the EMA and FDA; (ii) engage in and perpetuate a massive insider selling scheme on behalf of the Individual Defendants; and (iii) violate the Company's own internal policies.

161. In addition, the above material misstatements served to maintain the Company's inflated stock price. Indeed, as a result of the above misstatements, Tetraphase stock price increased 6.6% from $41.85 per share on August 6, 2015 to $44.82 per share on August 10, 2015.

**THE TRUTH IS REVEALED**

162. On September 8, 2015, the Company issued a press release announcing that the pivotal portion of the IGNITE2 Phase 3 clinical trial of Eravacycline administered as an IV to oral transition therapy for the treatment of cUTIs did not achieve its primary endpoint of statistical non-inferiority compared to Levofloxacin. Significantly, Eravacycline failed to meet the statistical endpoints established by ***both*** the FDA and the EMA. The press release stated in pertinent part:

> **WATERTOWN, Mass., September 8, 2015** – Tetraphase Pharmaceuticals, Inc. (NASDAQ:TTPH), a clinical stage biopharmaceutical company developing novel antibiotics to treat life-threatening multidrug-resistant (MDR) infections, today announced that ***the IGNITE2 phase 3 clinical trial of eravacycline administered as an IV to oral transition therapy for the treatment of complicated urinary tract infections (cUTI) did not achieve its primary endpoint of statistical non-inferiority compared to levofloxacin.***
>
> "We are disappointed that the IGNITE2 trial did not achieve its primary endpoint. We plan to further analyze the data and provide an update after we have discussed

> the data and our plans for a path forward with the regulatory agencies," said Guy Macdonald, President and CEO of Tetraphase. "We previously announced positive data from the IGNITE1 phase 3 clinical trial of eravacycline administered intravenously in complicated intra-abdominal infections which did meet its primary endpoint, demonstrating high cure rates in prevalent Gram-negative pathogens and a favorable safety profile."
>
> Macdonald added, "We continue to believe that eravacycline can benefit patients with serious infections, particularly those caused by difficult-to-treat Gram-negative bacteria."
>
> The pivotal portion of the phase 3 IGNITE2 clinical trial enrolled 908 patients who were randomized 1:1 to receive eravacycline (1.5 mg/kg intravenously every 24 hours followed by 200 mg orally every 12 hours) or levofloxacin (750 mg intravenously every 24 hours followed by 750 mg orally every 24 hours). Each patient received a minimum of 3 days of IV dosing and then, if clinically indicated, were eligible to transition to oral therapy for the remaining doses for a total treatment period of 7 days. For the U.S. Food and Drug Administration (FDA), the primary analysis evaluated the responder outcome (a combination of clinical cure rate and microbiological response) in the Microbiological Intent-to-Treat (micro-ITT) population at the Post-Treatment (PT) visit (defined as 6-8 days after the completion of therapy) using a 10% non-inferiority margin. For the European Medicines Agency (EMA), the primary analysis evaluated the microbiological response in the microbiologically modified ITT (micro-MITT) population and microbiologically evaluable (ME) populations at the PT visit using a 10% non-inferiority margin. ***Eravacycline did not achieve the primary endpoint under either analysis.***

(Emphasis added).

163. Also on September 8, 2015, Tetraphase held a conference call after announcing the news of the failed study. According to Defendant Macdonald, Tetraphase was in possession of the IGNITE 2 phase 3 results as early as "at the end of last week [meaning September 3 or 4, 2015]."

164. As a result of these adverse results, the price of Tetraphase common stock declined from a closing share price of $44.78 on September 8, 2015 to close at $8.36 per share on September 10, 2015, ***a loss of more than 80% or $1.3 billion in market value***, on extremely heavy trading volume.

## TETRAPHASE'S INTERNAL CONTROL VIOLATIONS

165. During the Class Period, Defendants falsely represented that Tetraphase maintained internal controls over financial reporting to ensure the reliability of the Company's financial reporting.

166. In addition, during the Class Period, Defendants concealed a chronic and systematic breakdown of the Company's internal accounting controls, thereby allowing the Company to, among other things, withhold and conceal the adverse clinical trial results from the IGNITE 2 pivotal Phase 3 trial, while allowing insiders, including the Individual Defendants, to sell off large blocks of their personal holdings of Tetraphase common stock at artificially inflated prices.

167. As a result of Defendants' failure to maintain effective internal control over financial reporting, they were able to conceal the adverse clinical trial results and profit from their insider sales.

168. As the SEC has explained, internal controls are fundamental and critical for summarizing and reporting financial data . . . ." 15 U.S.C. § 78m(b)(2).[38] Indeed, a lack of fundamental internal controls, as here, constitutes a "material weakness" that should be immediately disclosed to investors under GAAP.

169. Generally accepted auditing standards ("GAAS") set forth the role of a Company's management in an audit of an entity's financial statements. Specifically:

> [M]anagement and, when appropriate, those charged with governance, have responsibility
>
> a. for the preparation and fair presentation of the financial statements in accordance with the applicable financial reporting framework;

---

[38] Specifically, the SEC requires a public company to: (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the issuer; and (b) devise and maintain a system of internal accounting controls . . . . " 15 U.S.C. § 78m(b)(2).

> b. for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error…[39]

170. The Individual Defendants were further required under Rule 302 of the Sarbanes-Oxley Act of 2002 to provide certifications relating to the company's internal controls over financial reporting in the False and Misleading Financial Statements.

171. Additionally, Section 302 of the Sarbanes-Oxley Act of 2002 required Defendants to maintain, assess and report on the effectiveness of the Company's internal control over financial reporting. The language provides the following, in relevant part:

> (a) REGULATIONS REQUIRED.—The Commission shall, by rule, require, for each company filing periodic reports under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m, 78o(d)), that the principal executive officer or officers and the principal financial officer or officers, or persons performing similar functions, certify in each annual or quarterly report filed or submitted under either such section of such Act that—
>
> (1) the signing officer has reviewed the report;
>
> (2) based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading;
>
> (3) based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report;
>
> (4) the signing officers—
>
> (A) are responsible for establishing and maintaining internal controls;
>
> (B) have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such

[39] AU-C Preface – *Principles Underlying an Audit Conducted in Accordance with Generally Accepted Auditing Standards.*

> officers by others within those entities, particularly during the period in which the periodic reports are being prepared;
>
> (C) have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report; and
>
> (D) have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date…

(Emphasis added).

172. Auditing standards established and adopted by the Public Company Accounting Oversight Board (the "PCAOB"), specifically Auditing Standard ("AS") No. 5, *An Audit of Internal Control over Financial Reporting that is Integrated with an Audit of Financial Statements and Related Independence Rules and Conforming Amendments* ("AS 5"), defines internal controls over financial reporting as follows:

> Internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and includes those policies and procedures that –
>
> (1) Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;
>
> (2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and
>
> (3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.[40]

---

[40] AS 5, Appendix A, A-5.

173. Professional accounting standards recognize that a company's control environment sets the tone of an *organization*, and is the foundation for all other components of internal control, providing discipline and structure. The Committee of Sponsoring Organizations of the Treadway Commission framework also discusses a Company's control environment as being one of five interrelated components of internal control, stating:

> Control environment. Senior management must set an appropriate "***tone at the top***" that positively influences the control consciousness of entity personnel. The control environment is the foundation for all other components of internal control and provides discipline and structure.

174. The Company's most senior executive management, comprised in substantial part of the Individual Defendants herein, embraced a "tone at the top" of ignoring and/or concealing Eravacycline's clinical trial results and studies, demonstrating Eravacycline, particularly when administered orally, is not effective to treat cUTIs. The purported control environment created by the Individual Defendants allowed for the concealment of material information concerning the Company's core business (Eravacycline) in order to facilitate these insiders' stock sales at artificially inflated prices.

175. Moreover, Defendants' failure to identify such control deficiencies (e.g., material weaknesses) within the Company rendered Defendants' Sarbanes Oxley reports in the False and Misleading Statements section materially false and misleading in turn, and contributed to the Company's issuance of materially false and misleading financial statements in violation of GAAS.

## ADDITIONAL SCIENTER ALLEGATIONS

176. As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated

to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

177. The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of Tetraphase and thus controlled the information disseminated to the investing public in the Company's press releases and SEC filings. As a result, each could falsify the information that reached the public about the Company's business and performance.

178. Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes herein to inflate the Company's stock price and profit from insider sales of large blocks of their personal holdings of Tetraphase stock. The Individual Defendants' scienter may be imputed to Tetraphase as the Individual Defendants were among the Company's most senior management and were acting within the scope of their employment.

179. The Individual Defendants knew that the Phase 3 IGNITE 2 pivotal trial had failed ***more than four months*** before they publicly disclosed the results to investors because: (A) the IGNITE 2 pivotal trial closed on or before April 20, 2015 and, thus, Defendants had the trial results at least by then; (B) prior Eravacycline clinical trials and studies showed the drug was ineffective against treating cUTIs; (C) tetracyclines have never been used to treat cUTIs because of their low urine concentration and bioavailability and, thus, have been abandoned by other drug sponsors; (D) Defendants had numerous meetings with the FDA in which they would have discussed the results of the clinical trials; (E) reporting requirements under the BARDA Contract required Defendants to continually review and evaluate clinical trial data with respect to Eravacycline; (F)

Eravacycline was Tetraphase's "core" business, as it was the only drug candidate in clinical trials and the Company's future hinged on its success; (G) the Individual Defendants have significant industry experience and thus, had a clear understanding of the clinical trial results and their impact on the Company; and (H) of the suspicious timing of Individual Defendants Thompson and Lubner's resignations, shortly after the Company announced the IGNITE 2 pivotal trial result.

## I. THE INDIVIDUAL DEFENDANTS' DIRECT KNOWLEDGE, AND/OR RECKLESS DISREGARD, THAT THE PIVOTAL IGNITE 2 TRIAL WOULD FAIL

### A. The Individual Defendants Were Aware That The IGNITE 2 Pivotal Trial Failed By at Least By April 20, 2015 Because They Were in Possession of the Final Trial Results

180. As discussed above, according to the Clinical Trial Registry for the EU, the pivotal Phase 3 IGNITE 2 clinical trial was completed on or about April 20, 2015. Accordingly, Defendants had the pivotal trial results by at least April 20 – nearly five months before they publicly disclosed their results to investors on September 8, 2015 – and, thus, knew the trial had failed. In addition, the DMC was likely reviewing the clinical trial data during the trial. Thus, Defendants likely knew that the pivotal Phase 3 trial was going to fail when they set up their 10b5-1 trading plans, in March 2015.

181. Moreover, in light of the Company's historical practice of rapidly analyzing clinical trial data, as it did with the lead-in portion of IGNITE 2, in which it analyzed the data in an abbreviated period, it is extremely likely that the Defendants had fully analyzed the data by May or June 2015. Meanwhile, Defendants did not disclose the failed trial results until September 8, 2015, after they dumped large blocks of their personal holdings of Tetraphase stock between May to September 2015.

### B. Earlier Eravacycline Clinical Trials and Studies Demonstrated it Could Not Be Effective in Treating cUTIs Because of Low Urine Concentration and Bioavailability

182. As discussed above, prior Eravacycline studies and early Eravacycline clinical trials showed that Eravacycline had a low urine concentration and low bioavailability, demonstrating that the drug would not be effective in treating cUTIs. For example, the Phase 3 IGNITE 1 trial results, announced in December 2014, revealed a low concentration of Eravacycline in the urine of 16% and a low bioavailability of 28% in the bloodstream after an oral dose. Moreover, as demonstrated above (*supra* ¶ 51) Eravacycline's bioavailability rate of only 28% is extremely low when compared to other commercially available antibiotics. Indeed, Eravacycline has a substantially lower bioavailability than most competitor drugs, including Levofloxacin, which has a bioavailability rate ***nearly 70% higher*** than Eravacycline.

183. Independent clinical studies have similarly found the bioavailability of Eravacycline is extremely low.

184. Accordingly, Defendants knew Eravacycline was not effective in treating cUTIs and, thus, would never meet the primary endpoints of the Phase 3 IGNITE 2 trial.

### C. Defendants Knew the Pivotal IGNITE 2 Trial Would Fail Because Tetracycline Antibiotics Have Never Been Used To Treat cUTIs and Similar Drugs Have Failed

185. Tetracyclines have never been an established drug class for cUTIs. In addition, past efforts to develop tetracyclines for the treatment of cUTIs, like Tigecycline, have been abandoned by other drug sponsors because tetracyclines have a low urine concentration and low bioavailability and, thus, are not effective in treating cUTIs. Accordingly, current professional society guidelines intended for medical practice do not recommend tetracyclines for the treatment of urinary tract infections, including cUTIs.

186. This information was available to Defendants prior to the pivotal IGNITE 2 trial and further supports an inference that Defendants knew or should have known that Eravacycline is not effective in treating cUTIs and that the pivotal IGNITE 2 trial would fail. Indeed, Tetraphase's Clinical Advisory Board includes the developer of Tigecycline, a similar tetracycline-class drug that failed for the same indication.

187. Accordingly, Defendants knew or should have known that Eravacycline, as a tetracycline derivative, had remarkably lower levels of bioavailability, which would cause the drug to fail the pivotal IGNITE 2 non-inferiority trial when compared to Levofloxacin, which has a demonstrated bioavailability level of 99%.

### D. The Individual Defendants Were Aware that Eravacycline Would Not Be Effective in Treating cUTIs as A Result of Constant Communications With the FDA

188. As a result of its fast-track designation granted in April 2014, Tetraphase was afforded the benefit of increased and frequent communications with the FDA to discuss the drug's development. Accordingly, during the Class Period, Defendants were, admittedly, in constant communication with the FDA regarding the clinical development of Eravacycline for the treatment of cUTIs and the status of the ongoing clinical trials, including through the following public admissions:

- In the April 2, 2014 Company press release announcing fast-track designation of Eravacycline for the treatment of cUTIs, Individual Defendant Macdonald stated that the Company "look[ed] forward to working closely with the FDA as we continue to advance eravacycline through Phase 3 development." (Emphasis added).

- In the Registration Statement filed in anticipation of the Company's March 2013 IPO, Defendants represented that "[Based on] our ***discussions with the FDA*** at our end-of-Phase 2 meeting in January 2013, we expect to conduct two global Phase 3 clinical trials of eravacycline, one for the treatment of cIAI and one for the treatment of complicated urinary tract infections, or cUTI. We expect to have top-line data from both of these clinical trials in the first quarter of 2015." (Emphasis added).

- The Registration Statement further stated: "In January 2013, ***we discussed our pivotal Phase 3 program with the FDA*** at an end-of-Phase 2 meeting. Following these discussions, we are now moving ahead with our plans to conduct two global Phase 3 clinical trials of the intravenous formulation of eravacycline, one for the treatment of cIAI, which we expect to commence in the third quarter of 2013, and one for the treatment of cUTI, which we expect to commence in the fourth quarter of 2013… In addition to developing an intravenous formulation of eravacycline, we are also developing an oral formulation." (Emphasis added).

- In the 2015 First Quarter Report, filed on May 7, 2015, Defendants represented: "***Consistent with guidance issued by the United States Food and Drug Administration ("FDA")***, with respect to the development of antibiotics for cIAI ***and the Company's discussions with the FDA***, the Company expects that positive results from these two phase 3 clinical trials will be sufficient to support submission of a new drug application ("NDA") for eravacycline in the treatment of cIAI and cUTI." (Emphasis added).

- In the 2015 Second Quarter Report, filed on August 8, 2015, Defendants affirmatively represented that the Company was having continued pre-NDA meetings with the FDA throughout the Class Period: "***As is customary, the Company has had and will continue to have several pre-NDA discussions with the FDA regarding the Company's NDA submission. Depending on the outcome of the FDA discussions and the pivotal portion of IGNITE2, the Company expects to submit an NDA to the FDA by the end of 2015 and a marketing authorization application to the European Medicines Agency in the first half of 2016***." (Emphasis added).

189. As a result of the above, Defendants were analyzing the Eravacycline clinical trial data in anticipation of these meetings and communications with the FDA and thus, were aware that Eravacycline was not effective in treating cUTIs at the time they made their contradictory false and misleading public statements that (among others) eravacycline would be a "first-line empiric monotherapy for the treatment of cIAI and cUTI."

**E. The Individual Defendants Were Aware that Eravacycline Would Not Be Effective in Treating cUTIs as A Result of Monthly Reporting Requirements Under the BARDA Contract**

190. The BARDA Contract requires the Company to: (i) schedule periodic meetings with the FDA, at which BARDA representatives must be present; and (ii) submit monthly, annual, and technical progress reports to BARDA reflecting the Company's clinical development of

Eravacycline. These obligations reflect that the Company was constantly analyzing clinical trial data in preparation of its meetings with the FDA and submission of progress reports to BARDA, and thus, that the Defendants were aware that Eravacycline was not effective in treating cUTIs throughout the entirety of the IGNITE 2 Phase 3 clinical trial.

191. More specifically, under Article C.2 "Reporting Requirements," the Company must prepare and submit certain progress reports in connection with the achievement of development milestones, including monthly progress reports "for the activities during the reporting period, and the activities planned for the ensuing reporting period." These reports must include a "technical progress" section detailing any "pertinent data and/or graphs sufficient detail to explain any significant results achieved and preliminary conclusions resulting from analysis and scientific evaluation of data accumulated to date under the contract." These reports must further detail any "problems encountered and proposed corrective action [and] differences between placed and actual progress."

192. Similarly, under Article C.2.B., the Company must prepare and submit an annual progress report "includ[ing] a summation of the results of the entire contract work for the period covered." These reports, like the monthly progress reports, must include a "technical progress" section detailing "the work performed…as described in the Integrated Master Plan." These reports must also include "a description of any problems (technical or financial) that occurred or were identified during the reporting period, and how these problems were resolved."

193. The Company must also submit intermittent technical progress reports detailing any "non-clinical and clinical trial reports." The results from these intermittent technical progress reports are then synthesized and complied for the submission of a "Final Technical Progress Report" which, in turn, must include a "summation of the work performed and the results obtained

for the entire contract period." Further, this report must include a "Results" section detailing the work performed, the results obtained, and "the impact of the results on the scientific and/or public health community."

194. Accordingly, the Company was contractually obligated to evaluate its clinical progress, including scientific data and any problems with the clinical development of Eravacycline, on a monthly, annual, and intermittent basis as clinical data was developed.

195. Finally, the BARDA Contract requires the Company to schedule periodic meetings with the FDA regarding clinical trial progress and permit BARDA staff to attend the FDA meetings.

196. The foregoing strongly reflects that the Company was consistently analyzing clinical trial data and reflecting upon the clinical development of Eravacycline throughout the Class Period.

**F. The Individual Defendants Knew the Pivotal IGNITE 2 Trial Was Failing Because The Clinical Development of Eravacycline is Tetraphase's "Core" Business**

197. As alleged herein, Eravacycline is Tetraphase's lead drug product and the ***only*** drug in clinical development. In addition to being a one-drug Company, Tetraphase is extremely small, with only 55 full-time employees. The Company has stated that it does not "expect to generate significant revenue unless and until [Tetraphase] obtain[s] marketing approval for, and commercialize, eravacycline."

198. Given that Eravacycline is Tetraphase's only viable drug product and the Company's financial viability depends on the success of Eravacycline, during the Class Period Eravacycline and the IGNITE 2 trial was the Company's "core business operations" and a "vital

corporate function" that Tetraphase's most senior executives are rightly presumed to have knowledge of as a matter of law.

199. Accordingly, knowledge of the falsity of the Company's public statements as related to these facts are properly ascribed to the Individual Defendants, who should have known of problems relating to the core operations of the Company that would have led them to the realization that the Company's public filings included false statements when issued.

### G. The Individual Defendants Knew the Pivotal IGNITE 2 Trial Would Fail As A Result Of Their Unique Industry Knowledge And Experience

200. The Individual Defendants are well-educated and experienced in the highly unique and niche field of novel antibiotic clinical development and have extensive biopharmaceutical backgrounds relating to this field. Thus, they had the ability to, and did, understand and analyze the ongoing clinical development of Eravacycline for the treatment of cUTIs.

201. Individual Defendant Macdonald is a 25-year veteran of the global pharmaceutical and biotechnology sector, with a wealth of experience in drug development and commercialization, particularly with antibiotics. Prior to his employment with Tetraphase, from August 2003 until January 2008, Macdonald was the Executive Vice President of Operations at Idenix Pharmaceuticals, Inc., a biopharmaceutical company engaged in the discovery and development of drugs for the treatment of human viral diseases in the United States and France. At Idenix, Macdonald oversaw the development of Idenix's commercial organization, and was responsible for regulatory affairs, quality assurance, manufacturing, information technology and project management. Prior to joining Idenix, Macdonald was employed at Merck & Co., Inc., a pharmaceutical company, from 1981 to 2003. At Merck, Macdonald was involved in the areas of virology and anti-infectives and was employed as Vice President of Anti-Infectives and Hospital Products. Macdonald directed the launch of five anti-infective products and led global business

strategy for Merck's HIV franchise. Macdonald received an Honors Degree in biochemistry from Dundee University in Dundee, Scotland.

202. Individual Defendant Thompson has been employed in various high level positions in the pharmaceutical and biotechnology sector, with a particular emphasis on antibiotic clinical development, for his entire career. Prior to his employment with Tetraphase, from January 2011 to December 2013, Thompson was the Chief Commercial Officer of Trius Therapeutics, Inc., a biopharmaceutical company that focused on the development of antibiotics. From 2003 to December 2010, Thompson was employed in various global and U.S. commercial roles with Pfizer Inc., a pharmaceutical and consumer healthcare company, most recently as Vice President of Marketing for Pfizer's Specialty Care Business Unit. From 1992 to 2003, Thompson was employed in positions of increasing responsibility at Merck & Co., Inc., where he most notably worked on the commercial planning and marketing activities for the company's anti-infectives as well as on major cardiovascular brands.

203. Individual Defendant Lubner has extensive experience in finance and operations at health care and life sciences companies. Concurrently with his employment at Tetraphase, Lubner was the CFO of Mediphase Venture Partners, a venture capital firm, from 2006 until October 2010. From 1999 to 2005, Lubner was the Vice President and CFO at PharMetrics, Inc., a pharmacy and medical claims data informatics company, until its acquisition by IMS Health in 2005. Prior to joining PharMetrics, Lubner was the Vice President and CFO of ProScript, Inc., a biotechnology company, from 1996 to 1999.

204. Thus, the Individual Defendants knew and understood the following, indicating that the pivotal IGNITE 2 trial would inevitably fail: (i) Eravacycline's chemical properties made it an ineffective treatment for cUTIs; (ii) Eravacycline would never be successful as an oral therapy;

(iii) Eravacycline did not meet its primary endpoint of statistical non-inferiority compared to Levofloxacin, and the Company would not be able to submit a NDA to the FDA within the time periods stated in their public filings, if ever; and (iv) the Company inappropriately rushed into the pivotal portion of the IGNITE 2 trial without properly analyzing the inconsistent and nonsensical dose response results of the lead-in portion of the trial. The Individual Defendants' education and employment backgrounds are so unique to the niche field of novel antibiotic clinical development that it would defy their proven professional capabilities absent fraud.

### H. The Curiously Timed Resignations of Individual Defendants Thompson and An Inference of Scienter

205. Shortly after Defendants' fraud was revealed to the market with the public announcement of the adverse Phase 3 pivotal IGNITE 2 trial results, a majority of the Individual Defendants resigned. On December 21, 2015, the Company announced that Individual Defendant Thompson had resigned from his position as COO, effective December 31, 2015. Only a few days later, on January 4, 2016, the Company announced that Individual Defendant Lubner had resigned from his position as CFO, effective January 8, 2016.

206. Defendant Thompson resigned from his position as COO less than two years after his appointment. No rationale was provided for his resignation, and his sudden departure is highly inconsistent with his historical employment practices. In particular, prior to his appointment at Tetraphase, Thompson was employed as the Chief Commercial Officer of Trius Therapeutics for over three years, and prior to that, was employed in various positions at Pfizer, Inc. and Merck & Co., Inc. for approximately eight years and twelve years, respectively. Lubner similarly suddenly resigned after almost ten years of employment with Tetraphase and no explanation, other than to purportedly "pursue other interests."

207. The sudden, suspicious departures of a majority of the Company's key executives, provides strong additional support that they knew of the Company's pervasive fraud during their tenure with the Company.

## II. THE INDIVIDUAL DEFENDANTS HAD MOTIVE TO MAKE FRAUDULENT REPRESENTATIONS

### A. The Individual Defendants Had Motive to Commit the Alleged Fraud to Sell Off Large Blocks of Their Personal Holdings of Tetraphase Common Stock

208. The Individual Defendants were motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to inflate Tetraphase's common stock price and maximize their individual profits through insider trading.

209. The Individual Defendants collectively sold 243,086 shares of Tetraphase common stock over the course of only four months during the Class Period for collective proceeds of approximately $10,517,964. Egregiously, certain large dispositions by the Individual Defendants occurred days and even hours before the Company announced the adverse results of its pivotal IGNITE 2 trial, on September 8, 2015.

210. The Individual Defendants' trades throughout the Class Period were highly unusual in both timing and amount, and correlated with market moving events or dates on which the Individual Defendants would likely be in possession of material non-public information. As such, their insider sales are probative of scienter.

#### 1. Individual Defendant Thompson's Insider Sales

211. During the Class Period, Individual Defendant Thompson sold 92,499 shares of Tetraphase stock, ***representing 40% of his total holdings in the Company***. In total, Thompson netted illicit proceeds of approximately $3,959,900 all while in the possession of material non-

public information and while the price of Tetraphase's stock was artificially inflated as a result of Defendants' materially false and misleading statements.

212. Thompson's Class Period sales and proceeds are reflected in the following table:

| DATE | NO. SHARES | PRICE | PROCEEDS | CORRELATING EVENT |
|---|---|---|---|---|
| **March 12, 2015** | 10b5-1 Trading Plan Established | | | • EMA waives clinical trial of Eravacycline in children on the basis that a trial was "likely to be ineffective or unsafe in part or all of the pediatric population."<br>• Defendants in possession of lead-in portion of IGNITE 2 trial indicating Eravacycline not effective in treating cUTIs.<br>• Defendants likely had interim results from pivotal portion of IGNITE 2 demonstrating trial was unsuccessful. |
| **May 15, 2015** | 30,000 | $39.63 | $1,188,900 | Defendants in possession of failed IGNITE 2 trial data. |
| **June 8 2015** | 22,499 | $43.50 | $973,000 | Defendants in possession of failed IGNITE 2 trial data. |
| **June 15, 2015** | 10,000 | $41.51 | $415,000 | Defendants in possession of failed IGNITE 2 trial data. |
| **July 6, 2015** | 10,000 | $47.91 | $479,100 | Defendants in possession of failed IGNITE 2 trial data. |

| | | | | |
|---|---|---|---|---|
| **August 5, 2015** | 10,000 | $46.31 | $463,100 | • Defendants in possession of failed IGNITE 2 trial data.<br><br>• Tetraphase announced Q2 2015 earnings on August 5, 2015. Defendant Macdonald announces in an earnings call that the IGNITE 2 trial results would be announced that financial quarter. |
| **September 8, 2016** | 10,000 | $44.08 | $440,800 | Following close of market, the IGNITE 2 trial results are announced and the stock price drops by 80%. |

213. For the two comparable six-month periods before the Class Period (September 2014 – February 2015 and February 2014 – August 2014), Thompson ***did not sell a single share*** of the Company's common stock. Moreover, since the Class Period ended, on September 8, 2015, Thompson also ***has not sold a single share*** of the Company's common stock. Accordingly, the frequency of these sales during the Class Period, and the proceeds earned, stand in stark contrast to his historical trading pattern.

214. Suspiciously, Thompson's last recorded sale on September 8, 2015, occurred mere ***hours*** before the Company announced the adverse results of its pivotal IGNITE 2 trial.

215. Exacerbating the obvious impropriety of this sale, Individual Defendant Macdonald announced in a subsequent earnings call on September 8, 2015 that the Company had been made aware of the results "at the end of last week," meaning either September 3 or 4, 2015. Thus, Thompson has conceded that he was in possession of material non-public information when this sale was made. The most innocuous explanation for the otherwise miraculous timing of this sale

is that the Defendants knowingly delayed the public announcement of the trial results several days while the Individual Defendants profited.

### 2. Individual Defendant Macdonald's Insider Sales

216. Individual Defendant Macdonald sold 101,087 shares of Tetraphase stock over the course of only four months, between May 2015 and September 2015. In total, Macdonald netted illicit proceeds of approximately $4,468,799 all while in possession of material non-public information and while the price of Tetraphase's stock was artificially inflated.

217. Macdonald's Class Period sales and proceeds are reflected in the following table:

| DATE | NO. SHARES | PRICE | PROCEEDS | CORRELATING EVENT |
|---|---|---|---|---|
| **March 12, 2015** | 10b5-1 Trading Plan Established | | | • EMA waives clinical trial of Eravacycline in children on the basis that a trial was "likely to be ineffective or unsafe in part or all of the pediatric population."<br>• Defendants in possession of lead-in portion of IGNITE 2 trial indicating Eravacycline not effective in treating cUTIs.<br>• Defendants likely had interim results from pivotal portion of IGNITE 2 demonstrating trial was unsuccessful. |
| **May 11, 2015** | 20,000 | $41.51 | $830,199 | Defendants in possession of failed IGNITE 2 trial data. |
| **June 1, 2015** | 10,000 | $41.86 | $418,600 | Defendants in possession of failed IGNITE 2 trial data. |
| **June 1, 2015** | 6,087 | $41.98 | $255,000 | Defendants in possession of failed IGNITE 2 trial data. |

| | | | | |
|---|---|---|---|---|
| **July 1, 2015** | 10,000 | $47.90 | $479,000 | Defendants in possession of failed IGNITE 2 trial data. |
| **July 20, 2015** | 15,000 | $50.72 | $760,800 | Defendants in possession of failed IGNITE 2 trial data. |
| **August 6, 2015** | 30,000 | $43.65 | $1,309,500 | • Defendants in possession of failed IGNITE 2 trial data.<br><br>• Tetraphase announced Q2 2015 earnings on August 5, 2015. Defendant Macdonald announces in an earnings call that the IGNITE 2 trial results would be announced that financial quarter. |
| **September 3, 2015** | 10,000 | $41.57 | $415,700 | Defendants in possession of failed IGNITE 2 trial data. |
| **September 2015 to Present** | Macdonald has not sold a single share since September 2015 and the present, a period of ten months | | | |

218. Macdonald's Class Period sales were significantly higher than those for a similar six-month period before or after the Class Period. Specifically, for the six-month period immediately preceding the Class Period (September 2014 – March 2, 2015) Macdonald sold 74,135 shares for proceeds of $2,361,699, or 25% less shares and 47% less proceeds than during the Class Period. For the six-month period before that (February 2014 – August 2014) Macdonald sold 85,000 shares for proceeds of $955,900, or 16% less shares and 78% less proceeds than what Macdonald sold during the Class Period.

219. By contrast, during the six-month Class Period, Macdonald sold over 100,000 shares, all of which were sold after the pivotal IGNITE 2 trial closed on or about April 20, 2015.

Suspiciously, Macdonald's last recorded sale on September 3, 2015 occurred mere *days* before the Company announced the adverse results of its pivotal IGNITE 2 trial.

220. Since the Class Period ended, on September 8, 2015, the same date that the adverse results of the IGNITE 2 trial were publicly announced, Macdonald has not sold a single share of the Company's common stock despite still beneficially owning approximately 64,000 shares as of February 29, 2016.

221. Accordingly, as demonstrated above, Macdonald's Class Period insider sales were unusual in both timing and amount.

### 3. <u>Individual Defendant Lubner's Insider Sales</u>

222. Individual Defendant Lubner sold 49,500 shares of Tetraphase stock over the course of only four months, between May 2015 and September 2015. In total, Lubner netted illicit proceeds of approximately $2,089,265 all while in possession of material non-public information and while the price of Tetraphase's stock was artificially inflated. Lubner's Class Period sales and proceeds are reflected in the following table:

| DATE | NO. SHARES | PRICE | PROCEEDS | CORRELATING EVENT |
|---|---|---|---|---|
| **March 12, 2015** | 10b5-1 Trading Plan Established | | | • EMA waives clinical trial of Eravacycline in children on the basis that a trial was "likely to be ineffective or unsafe in part or all of the pediatric population."<br><br>• Defendants in possession of lead-in portion of IGNITE 2 trial indicating Eravacycline not effective in treating cUTIs. |

| | | | | |
|---|---|---|---|---|
| | | | | • Defendants likely had interim results from pivotal portion of IGNITE 2 demonstrating trial was unsuccessful. |
| **May 14, 2015** | 15,000 | $39.28 | $589,200 | Defendants in possession of failed IGNITE 2 trial data. |
| **June 12, 2015** | 10,000 | $41.29 | $412,900 | Defendants in possession of failed IGNITE 2 trial data. |
| **June 15, 2015** | 7,500 | $41.67 | $312,525 | Defendants in possession of failed IGNITE 2 trial data. |
| **July 14, 2015** | 7,500 | $48.92 | $366,900 | Defendants in possession of failed IGNITE 2 trial data. |
| **August 14, 2015** | 9,500 | $42.92 | $407,740 | • Defendants in possession of failed IGNITE 2 trial data.<br>• Tetraphase announced Q2 2015 earnings on August 5, 2015. Defendant Macdonald announces in an earnings call that the IGNITE 2 trial results would be announced that financial quarter. |

223. Lubner's Class Period sales were significantly higher than those for a similar six-month period before or after the Class Period. Specifically, for the six-month period immediately preceding the Class Period (September 2014 – March 2, 2015) Lubner did not sell a single share of Tetraphase stock. For the six-month period before that (February 2014 – August 2014) Lubner sold 32,474 shares for proceeds of $434,720, or 35% less shares and 80% less proceeds than what Lubner sold during the Class Period

224. Since the Class Period ended, Lubner has not sold a single share of Tetraphase common stock despite still beneficially owning approximately 69,270 shares as of February 29, 2016. On January 4, 2016, Lubner resigned, effective January 8, 2016.

225. For those stock sales Thompson, Macdonald, and Lubner made pursuant to a 10b5-1 plan, the circumstances under which those plans were created belie any inference that they were established in good faith. All of the plans in question were entered into during the Class Period, well after Defendants knew or should have known that Eravacycline was not effective in treating cUTIs and would never meet its primary endpoint of statistical non-inferiority when compared to Levofloxacin in the pivotal IGNITE 2 trial.

226. Moreover, the Individual Defendants' sales were irregular in terms of the number of shares sold and they occurred at irregular intervals. Sales pursuant to a trading plan should occur with a prescribed, regular pattern of stock sales, such as 500 shares a month on the 10th day of the month. This was not the case here. As reflected in the charts above, the Individual Defendants' trades were irregular and often correlated with market moving events or dates on which the Individual Defendants would likely be in possession of material non-public information, and therefore are inherently suspicious.

227. Even if the Individual Defendants could demonstrate that their trading was not irregular (and they cannot), 10b5-1 plans have been heavily scrutinized by the SEC in light of an eye-opening *Wall Street Journal* investigation that found that insiders who were trading pursuant to such plans still were trading at opportune times and reaping better-than-expected results. According to the article, executives still can time their trades to avoid losses and increase earnings

because trading plans are not public and can be canceled or amended at any time without disclosure.[41]

228. Similarly, according to a report issued by the law firm Wilson Sonsini Goodrich & Rosati in March 2013, "[t]he floodlights now aimed at such [trading] plans are the result of recent Wall Street Journal articles showing that corporate insiders, even those executing trades pursuant to Rule 10b5-1 plans, have generated significant profits—or avoided significant losses—by trading company stock in the days just before their companies issued market-moving news." The report suggests that clients adopt "[s]imple plans with a prescribed, regular pattern of stock sales (e.g., 1,000 shares a month on the 15th day of the month)."[42]

**B. The Individual Defendants Had Motive to Commit the Alleged Fraud to Satisfy the Milestone Payments Under the License Agreement**

229. The Individual Defendants were motivated to commit the alleged in order to satisfy the Company's continuing obligations under the License Agreement.

230. The Company touted the importance of the License Agreement in numerous public statements and filings. For instance, in the 2014 Annual Report, Tetraphase touted the License Agreement as integral to the Company's future success, stating in relevant part:

> We believe that our proprietary chemistry technology, licensed from Harvard University on an exclusive worldwide basis and enhanced by us, represents a significant innovation in the creation of tetracycline drugs that has the potential to reinvigorate the clinical and market potential of the class.

231. Section 5.1 further specifies that Tetraphase must achieve each of the Development Milestones – defined by the License Agreement as the development and commercialization

---

[41] *See* Susan Pulliam & Rob Barry, *Executives' Good Luck in Trading Own Stock*, Wall St. J. (Nov. 27, 2012) at http://www.wsj.com/articles/SB10000872396390444100404577641463717344178.

[42] Steve Bochner & Nicki Locker, *WSGR Insight & Analysis* (Mar. 2013) available at https://www.wsgr.com/PDFSearch/Rule-10b5-1-trading-plans.pdf.

milestones under the Development Plan – within the time periods specified in the Development Plan. Such milestones include the successful completion of the "Phase I Clinical Trial," "Phase II Clinical Trial," and "Phase III Clinical Trial," as well as the acceptance of a NDA by the FDA.

232. Failure to timely achieve these milestones is considered a material breach under Section 11.2.3.1 of the License Agreement, and provides Harvard with the "sole and exclusive remedy" to terminate the License Agreement. In the event the License Agreement is terminated due to a material breach, Section 11.3 provides that all rights and licenses granted under the License Agreement to Tetraphase will automatically revert back to Harvard.

233. Thus, if the Company failed to achieve any of the development milestones under the License Agreement, including the successful completion of a "Phase III Clinical Trial" and submission on a NDA, within the time periods specified in the development plan, Harvard could terminate the License Agreement, and the Company would lose its right to Eravacycline entirely.

234. Tetraphase must also pay Harvard certain milestone payments for each licensed product candidate of up to $15.1 million, "regardless of whether such milestones are achieved." Failure to maintain these milestone payments is considered a material breach under the License Agreement. Thus, if the Company failed to meet its milestone payments owed under the License Agreement, Harvard could terminate the agreement and the Company would lose its right to Eravacycline entirely.

235. Moreover, under Section 11.2.2, Harvard may immediately terminate the License Agreement if Tetraphase is unable to obtain adequate financing. Accordingly, as discussed below, the Individual Defendants were motivated to commit the alleged fraud in order to preserve financing under the BARDA Contract, in order timely make milestone payments and keep the Company's rights to the License Agreement.

### C. The Individual Defendants Had Motive to Commit the Alleged Fraud to Preserve BARDA Financing

236. The Individual Defendants were motivated to commit the alleged in order to preserve Tetraphase's primary source of financing under the BARDA Contract.

237. Since 2012, the Company has used the BARDA financing to fund the clinical development of Eravacycline for various indications, including for cUTIs and cIAIs. The Company emphasized the importance of the BARDA Contract in numerous public statements and filings as the Company's "only source of external funding," pursuant to which the Company has "derived all of [its] revenue to date."

238. The BARDA Contract requires the Company to achieve certain development milestones (*i.e.*, goals for the continuing clinical development of Eravacycline) within the prescribed time period of February 1, 2012 to January 31, 2017 to receive continued financing.

239. The successful completion of the development milestones meant the Company would be eligible for additional, continued, financing of "up to" approximately $39.8 million. To the extent that the Company is unable to comply with these time constraints, it must suffice with the financing already committed under the BARDA Contract, or seek alternative sources of financing.

240. Accordingly, financing under the BARDA Contract, is highly contingent on the Company's ability to meet certain clinical development milestones within an abbreviated timeframe and, to receive full financing, the Company *must* complete all clinical development milestones by the definitive performance deadline of January 31, 2017.

241. The definitive performance deadline of January 31, 2017 meant that, functionally, the Company had to conduct the pivotal IGNITE 2 trial when it did – regardless of whether the data truly supported it – because waiting any longer would mean the BARDA Contract would

likely expire before the Company could mount a commercial launch of Eravacycline for any indication. Indeed, the Company recently announced in May 2016 that, based on guidance provided by the FDA, it plans to conduct a pivotal phase 3 clinical trial of Eravacycline for cIAIs and results from the trial will be due, at the earliest, by the fourth quarter 2017 – well after the BARDA contract has expired.

242. Accordingly, failure to maintain BARDA financing would have been a fatal blow to the Company. In the event the BARDA financing was terminated or expired before the Company could submit a NDA, the Company would be forced to scramble to find alternative financing sources, or alternatively, indefinitely suspend the clinical development of Eravacycline for all contemplated indications. Even worse, in the event the License Agreement was terminated due to a material breach, the Company's rights over Eravacycline would revert to Harvard and the years of clinical development and expenses incurred would be for naught. The Company, therefore, had a compelling incentive to conduct the pivotal IGNITE 2 trial in order to satisfy its obligations under both the BARDA Contract and the License Agreement, despite knowledge that the trial would fail.

### D. The Individual Defendants Had Motive to Commit the Alleged Fraud to Preserve Their Excessive Performance Bonuses

243. The Individual Defendants were further motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to maximize their individual profits through excessive performance-based bonuses.

244. During the Class Period, Defendants reaped hundreds of thousands of dollars from incentive-based compensation tied to the Company's performance, particularly to the Company's clinical development of Eravacycline. Specifically, according to the Company's 2015 Proxy Statement filed with the SEC on Schedule 14A on April 30, 2015, Tetraphase maintains a

"Performance Bonus Program" under which the Individual Defendants are eligible to receive short-term performance-based compensation in the form of cash bonuses. Each Individual Defendant was eligible for a performance bonus on an annual basis of up to a predetermined percentage of his base salary. For example, in both 2014 and 2015, Individual Defendant Macdonald was eligible for a performance bonus of up to 50% of his base salary, while Individual Defendants Thompson and Lubner were eligible for performance bonuses of up to 35% of their base salary.

245. These performance bonuses were purportedly awarded in amounts based upon the achievement of certain corporate and individual goals and objectives approved by the Compensation Committee and included:

- The preparation and filing of a NDA for Eravacycline;
- The preparation of a commercial launch of Eravacycline in the United States, assuming approval of the NDA; and
- Partnership to help support the commercialization of Eravacycline outside the United States.

246. Moreover, despite the Company's own internal policies to award performance bonuses of a predetermined percentage of the recipients' base salary, the Individual Defendants and other Company executives have repeatedly received performance bonuses in excess of that limitation, as reflected in the chart below:

| YEAR | EXECUTIVE | PERCENT ALLOWED | BASE SALARY | BONUS | ACTUAL PERCENT AWARDED |
|---|---|---|---|---|---|
| **2013** | Macdonald | 50 | $382,433-<br>$400,000* | $206,157 | 52 - 54 |
| | Patrick Horn (Chief | 35 | $332,561- | $129,707 | 38 - 39 |

| | | | | | |
|---|---|---|---|---|---|
| | Med. Officer) | | $340,000* | | |
| | Lubner | 35 | $282,503-<br>$300,000* | $117,816 | 39 - 42 |
| **2014** | Macdonald | 50 | $420,000 | $283,500 | 67.5 |
| | Horn | 35 | $360,000 | $190,000 | 52.8 |
| | Lubner | 35 | $318,000 | $170,000 | 53.5 |
| | Thompson | 35 | $340,000 | $136,000 | 40** |
| * = salaries were increased on June 1, 2013 without a shareholder vote. | | | | | |
| ** = bonus was prorated to account for later start date of employment. | | | | | |

247. As reflected in the chart above, the Company has historically paid the Individual Defendants (and other executives) performance bonuses in material excess of that allowed by the Company's own stated internal policies. Indeed, until the adverse results of the pivotal IGNITE 2 trial were announced, the Defendants never complied with their own compensation policies since Tetraphase's inception as a publicly traded company.

248. Following the public announcement of the pivotal IGNITE 2 trial results, the Individual Defendants' performance bonuses were significantly reduced. Accordingly, the Individual Defendants had every incentive to paint the clinical development of Eravacycline through rose-colored glasses because their lucrative bonuses were directly tied to the status of Eravacycline's development.

### E. The Individual Defendants Had Motive to Commit the Alleged Fraud to Complete the Secondary Offering and Secure Alternative Financing

249. The Individual Defendants were motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to

maximize proceeds from the March 2015 Secondary Offering, which would serve as an alternative source of financing. Indeed, these efforts to secure alternative financing support a direct inference that the Defendants knew the pivotal IGNITE 2 trial would fail, and the BARDA contract would either: (i) be terminated; or (ii) expire before the Company could re-conduct a Phase 3 trial of Eravacycline for the treatment of cUTIs.

250. Thus, Defendants were motivated to issue materially false and misleading statements with respect to Eravacycline and the pivotal IGNITE 2 trial in order to obtain additional financing when the BARDA Contract was inevitably terminated or expired. The Secondary Offering is therefore indicative of, and consistent with, the Defendants concerns the pivotal IGNITE 2 trial would fail, and the BARDA contract would be terminated or expire before the Company could submit a NDA.

251. Without the security of continued BARDA financing, the Company's future was bleak without an alternative financing source.

252. Ultimately, Tetraphase raised proceeds of approximately $173.1 million from the sale of 4.945 million shares of common stock at $35.00 per share, before deducting the underwriter discount and commissions. The date the offering closed, on March 17, 2015, Tetraphase shares reached intraday trading levels of more than $40.00 per share. This Secondary Offering would have been negatively impacted if the truth about the Company's tenuous chances of achieving FDA approval for Eravacycline were actually disclosed.

## LOSS CAUSATION

253. During the Class Period, the Defendants named in this Action materially misled the investing public, thereby inflating the price of Tetraphase common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make their

own statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Tetraphase's business, operations, and prospects as alleged herein.

254. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, the Defendants named in this Action made or caused to be made a series of materially false and/or misleading statements about Eravacycline, its effectiveness and the pivotal IGNITE 2 phase 3 clinical trial. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times. The materially false and/or misleading statements made by the Defendants named in this Action during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein. For example:

- In response to a March 11, 2015 Press Release announcing the pricing of the public offering, and the March 12, 2015 filing of the Offering Prospectus, which marketed the Company's products as "significant innovation[s] in the creation of tetracycline drugs" and touted Eravacycline's capacity for regulatory approval by stating, "we expect to submit a NDA to the FDA by the end of 2015," the Company's stock price increased 13.6% from $35.41 per share on March 10, 2015 to $40.23 per share on March 17, 2015.

- In response to a Press Release on April 15, 2015 announcing that Gerri Howard was appointed to the Company's board of directors and that "Gerri's depth of industry and regulatory experience will be valuable to us as our lead antibiotic candidate, eravacycline, advances through the final stages of clinical development", the Company's stock price increased 4.17% from $39.07 per share on April 15, 2015 to $40.70 on April 23, 2015.

- In response to the 2015 First Quarter Report filed on May 6, 2015 and accompanying press releases, which represented that the Company was developing Eravacycline "for use as a first-line empiric monotherapy for the treatment of multidrug-resistant infections, including multidrug-resistant Gram-negative infections," the Company's stock price increased 12.93% from $36.89 per share on May 6, 2015 to $41.66 per share on May 11, 2015.

255. During the Class Period, as detailed herein, the Defendants engaged in a scheme to deceive the market and perpetuate a course of conduct that caused the price of Tetraphase shares to be artificially inflated by failing to disclose and/or misrepresenting the adverse facts detailed herein. As the Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the artificial inflation in the price of Tetraphase shares was removed, and the price of Tetraphase shares fell. For example:

- In response to the September 8, 2015 Press Release, disclosing Eravacycline's pivotal IGNITE2 failure, the Company's stock price decreased a tremendous 78.81% from $44.78 per share on September 8, 2015 to a low of $9.49 per share on September 9, 2015.

256. As a result of their purchases of Tetraphase shares during the Class Period at artificially inflated prices, Plaintiffs, and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

257. The timing and magnitude of the price decline in Tetraphase shares negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## CLASS ACTION ALLEGATIONS

258. Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired Tetraphase

shares between March 5, 2015 and September 8, 2015, inclusive, seeking to pursue remedies under the Exchange Act (the "Class").

259. Excluded from the Class are Tetraphase and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

260. Because Tetraphase had millions of shares outstanding during the Class Period, and because its shares were actively traded on the NASDAQ, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiffs believe that there are, at a minimum, thousands of Class members. Members of the Class may be identified from records maintained by Tetraphase or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

261. Plaintiffs' claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein.

262. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and securities litigation.

263. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

a. Whether Defendants violated the federal securities laws as alleged herein;

b. Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about Tetraphase's business and operations;

c. Whether the price of Tetraphase shares was artificially inflated during the Class Period; and

d. The extent to which members of the Class have sustained damages and the proper measure of damages.

264. A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## NO STATUTORY SAFE HARBOR

265. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Class Action Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward- looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Tetraphase who knew that the statement was false when made.

## APPLICABILITY OF FRAUD ON THE MARKET DOCTRINE

266. The market for Tetraphase common stock was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Tetraphase stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's stock relying upon the integrity of the market price of Tetraphase and market information relating to the Company, and have been damaged thereby.

267. During the Class Period, the artificial inflation of Tetraphase stock was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, the Defendants named in this Action made or caused to be made a series of materially false and/or misleading statements about Tetraphase's business, prospects, operations, and the ability of Eravacycline to reach a favorable outcome in the IGNITE 2 phase 3 clinical trial. These material misstatements and/or omissions created an unrealistically positive assessment of Tetraphase and its business, operations, and prospects, thus causing the price of the Company's stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. The Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's stock at such artificially inflated prices, and each of them has been damaged as a result.

268. At all relevant times, the market for Tetraphase common stock was an efficient market for the following reasons:

a. Tetraphase common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b. As a regulated issuer, Tetraphase filed periodic public reports with the SEC and the NASDAQ;

c. Tetraphase communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d. During the class period, on average, over several hundreds of thousands of shares of Tetraphase stock were traded on a weekly basis. On news days, the Company's trading volume increased into the millions, reflecting an active trading market for Tetraphase common stock and investors' expectations being impounded into the stock price; and

e. The proportion of statistically significant stock price movement days for Tetraphase common stock on news days is significantly over the proportion of non-news days and, thus, Tetraphase common stock is more likely to have a statistically significant return on a day with news than no-news, consistent with an informationally efficient market.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against Tetraphase and the Individual Defendants

269. Plaintiffs reallege each allegation as if fully set forth herein.

270. This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Tetraphase, Macdonald, Thompson, and Lubner (the "Count I Defendants").

271. The Count I Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

272. The Count I Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

273. The Count I Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

274. As a result of the Count I Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiffs and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

275. Tetraphase is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of respondeat superior, as those persons were acting as the officers, directors, and/or agents of Tetraphase in taking the actions alleged herein.

276. Plaintiffs and the Class purchased Tetraphase common stock, without knowing that the Count I Defendants had misstated or omitted material facts about the Company's performance or prospects. In so doing, Plaintiffs and the Class relied directly or indirectly on false and misleading statements made by the Count I Defendants, and/or an absence of material adverse information that was known to the Count I Defendants or recklessly disregarded by them but not disclosed in the Count I Defendants' public statements. Plaintiffs and the Class were damaged as a result of their reliance on the Count I Defendants' false statements and misrepresentations and omissions of material facts.

277. At the time of the Count I Defendants' false statements, misrepresentations and omissions, Plaintiffs and the Class were unaware of their falsity and believed them to be true. Plaintiffs and the Class would not otherwise have purchased Tetraphase stock had they known the truth about the matters discussed above.

278. By virtue of the foregoing, the Count I Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

279. As a direct and proximate result of the Count I Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their purchase of Tetraphase common stock.

280. This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against Tetraphase and the Individual Defendants

281. Plaintiffs reallege each allegation as if fully set forth herein.

282. This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against Tetraphase, Macdonald, Thompson, and Lubner (the "Count II Defendants").

283. Each of the Count II Defendants, by reason of their status as senior executive officers and/or directors of Tetraphase, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of §20(a) of the Exchange Act. The Count II Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiffs' and the Class' investments in Tetraphase common stock within the meaning of §20(a) of the Exchange Act. Therefore, the Count II Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

284. The Count II Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Count II Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

285. The Count II Defendants knew or recklessly disregarded the fact that Tetraphase's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Count II Defendants did not act in good faith.

286. By virtue of their high-level positions and their participation in and awareness of Tetraphase's operations and public statements, the Count II Defendants were able to and did influence and control Tetraphase's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

287. The Count II Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

288. As set forth herein, the Count II Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Count II Defendants are also liable pursuant to §20(a) of the Exchange Act.

289. As a direct and proximate result of the Count II Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase of Tetraphase common stock.

290. This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs as representatives of the Class;

B. Awarding Plaintiffs and the members of the Class damages, including interest;

C. Awarding Plaintiffs reasonable costs and attorneys' fees; and

D. Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial of all issues involved, now, or in the future, in this action.

Dated: July 25, 2016

Respectfully Submitted,

*/s/Shannon L. Hopkins*

Shannon L. Hopkins (BBO # 657485)
LEVI & KORSINSKY LLP
733 Summer Street, Suite 304
Stamford, Connecticut 06901
Tel.: (203) 992-4523
Fax: (212) 363-7171
shopkins@zlk.com

*Counsel for Plaintiff Newvana and Co-Lead Counsel for the Class*

Joseph P. Guglielmo (BBO #671410)
SCOTT & SCOTT, ATTORNEYS AT LAW, LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Tel.: (212) 223-6444
Fax: (212) 223-6334
jguglielmo@scott-scott.com

*Counsel for Plaintiff Plymouth and Co-Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I, Shannon L. Hopkins, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 25th day of July, 2016.

*/s/Shannon L. Hopkins*
Shannon L. Hopkins